2007 OK CR 27

**Benjamin Robert COLE, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2004–1260.**

Court of Criminal Appeals of Oklahoma.

July 11, 2007.

---

G. Lynn Burch, James C. Bolen, Okla. Indigent Defense System, Capital Trial Division, Sapulpa, OK, counsel for appellant at trial.

Ray Hasselman, First Assistant District Attorney, Patrick Abitbol, Assistant District Attorney, Claremore, OK, counsel for the State at trial.

James L. Hankins, Ogle & Welch, Oklahoma City, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, counsel for the State on appeal.

## OPINION

LUMPKIN, Presiding Judge.

¶1 Appellant, Benjamin Robert Cole, was tried by jury in the District Court of Rogers County, Case Number CF–2002–597, and convicted of First Degree Murder, in violation of 21 O.S.Supp.2001, § 701.7(C). The jury found the existence of two aggravating circumstances: (1) that Appellant had been previously convicted of a felony involving the use or threat of violence to the person; and (2) that the murder was especially heinous, atrocious, or cruel. The jury set punishment at death, and the trial judge sentenced Appellant in accordance with this verdict. Appellant now appeals.[1]

¶2 Appellant's nine-month-old daughter, Brianna Cole, was murdered on December 20, 2002. According to the State Medical Examiner, Brianna's spine had been snapped in half, and her aorta had been completely torn through due to non-accidental stretching. The official cause of death was described as a fracture of the spine with aortic laceration.

¶3 Appellant eventually admitted causing the fatal injuries. In a statement he gave to police, Appellant said he'd been trying, unsuccessfully, to get the child, who was lying on her stomach, to stop crying. Appellant eventually grabbed his daughter by the ankles and pushed her legs toward her head until she flipped over. This action broke the child's back and resulted in fatal injuries.

¶4 Evidence was admitted that Appellant took no remedial action just after this incident happened. He went and played video games, denied anything was wrong with the child when confronted by his wife, and said nothing to rescue or medical personnel about what had happened. (He did, however, attempt CPR when the situation turned grave,

1. Appellant's Petition in Error was filed in this Court on May 11, 2005. His initial brief was filed on January 23, 2006. The State's brief was then filed on May 24, 2006, and a Reply brief was filed on July 10, 2006. The case was submitted to this Court on June 1, 2006, and oral arguments were held on December 19, 2006.

before the ambulance arrived.) Only after rescue efforts had failed and an autopsy was performed did the medical personnel learn that Brianna's spine had been snapped. The autopsy physician testified that the injury required a great amount of force and would not be the result of normal back-bending by a nine month old. The death was eventually ruled a homicide. When told of this fact by the authorities, Appellant asked, "How many years am I looking at?" At this point, Appellant confessed his responsibility for the injuries.

### PRE–TRIAL ISSUES

■ ¶ 5 In proposition two, Appellant claims the trial court's denial of his motion for a trial continuance in order to prepare and acquire critical mitigation evidence violated his Constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Section 7 of Oklahoma's Constitution.

¶ 6 It seems that three weeks before trial, Cole's defense attorneys had obtained an MRI of Appellant's brain that allegedly revealed abnormalities. Believing this evidence could be mitigating, counsel sought to develop it further by hiring an expert. Twelve days before trial, counsel filed an affidavit and motion for continuance, stating that further analysis of the MRI images "may be necessary," that Appellant was being uncooperative, and that due to a depleted OIDS staff, counsel had other duties that were preventing them from providing a zealous defense.

¶ 7 Eight days before trial, the trial court heard oral arguments concerning the motion. The State objected to the requested continuance. The Court ultimately ruled that none of the parties were at fault with regard to the delayed MRI testing, but that based upon how long the case had been pending, docketing matters, the retention of an expert who could look at and evaluate the MRI, and the substance of the request, that no continuance was necessary.

¶ 8 Considering the record as a whole, we find no abuse of discretion in this ruling. *White v. State*, 1980 OK CR 10, ¶ 5, 607 P.2d 713, 714. This claim relies on speculation of what might have been found had additional time been granted to perform additional testing. In making its ruling, the trial court obviously considered the additional time between that day and the time defense counsel had remaining before such evidence would have to be presented. The trial court left open a window of opportunity for counsel to accomplish exactly what it wanted. At least two defense witnesses touched upon the subject at hand. While a potential for developing even better evidence on a particular issue nearly always exists, the decision to cut off that window of opportunity in the instant case did not amount to an abuse of discretion. Moreover, we find no ineffective assistance of trial counsel with respect to the way the defense team handled this issue and no prejudice, as no evidence has apparently been developed in the two years since Appellant's trial occurred. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

■ ¶ 9 In proposition four, Appellant claims the trial court denied him the right to effective assistance of counsel after he developed a conflict with his trial counsel and requested to have them replaced. The denial of that request, Appellant argues, was a violation of the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, sections 7 and 20 of the Oklahoma Constitution.

¶ 10 As Appellant's brief freely admits, by the time of trial Appellant "had withdrawn into extreme religiosity, made little if any effort to assist his attorneys or to prepare his defense while awaiting inspiration from God, and sat through the entire trial at counsel table literally not moving a muscle for hours on end while reading the Bible." The record shows Appellant sought to fire his attorneys less than a month before trial, due to "Religious Prejudices." Appellant requested a "Pentecostal team of lawyers" or "of the like". Apparently, due to his trial counsel's tactic of using his extreme religious beliefs to help demonstrate mental incompetence, Appellant believed his attorneys had "spit in the face of God." When questioned by the trial court concerning this issue, Appellant ex-

plained his belief that his attorneys had exaggerated his religious stance and therefore he refused to talk with them.

¶ 11 The trial court refused to appoint new counsel, however, basing its decision on reasons that are fully supported by the record. We see no "complete breakdown in communication" of the type addressed in *Romero v. Furlong,* 215 F.3d 1107, 1111 (10th Cir.2000) and *United States v. Lott,* 433 F.3d 718, 725–26 (10th Cir.2006). Instead, this record suggests an uncooperative defendant who, religious differences aside, substantially and unreasonably contributed to the communication breakdown. This proposition is without serious merit.

### FIRST STAGE TRIAL ISSUES

¶ 12 In proposition one, Appellant claims evidence of his prior criminal conviction and prison sentence in California for aggravated child abuse was erroneously admitted during first stage proceeding, through multiple witnesses, resulting in "overwhelmingly unfair prejudice" in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, Section 7 of Oklahoma's Constitution.

¶ 13 The record shows that Appellant had been convicted, eighteen years previously, of aggravated child abuse in California. The injuries in that case were committed by Appellant against his then six month old son and consisted of a cigarette burn to the eyelid, bruises on the head, older bruises to the arms and torso, bruising to the genitals, and a broken ankle.

¶ 14 The State filed a *Burk's* notice in which it sought to admit this evidence under exceptions to the statutory prohibition against introducing prior crimes or bad acts in order to show action in conformity with character. See 12 O.S.2001, § 2404(B). The State listed four possible exceptions in its notice that might be applicable to this evidence: (1) common plan or scheme; (2) lack of mistake or accident; (3) *Myers v. State's* greater latitude rule; and (4) *res gestae.* The trial judge ultimately ruled that the evidence was admissible under the "absence of mistake or accident" exception. As a result, jurors were informed in various ways, including during arguments and witness testimony, that Appellant had a child abuse history that raised red flags.

■ ¶ 15 Before turning to the court's ruling and how it was applied at trial, we note that two of the other exceptions listed above could not have been used to admit this damaging character evidence. That is, Appellant's eighteen year old acts of child abuse would not qualify under the common plan or scheme exception, as the only similarities between the crimes were the age and relation of the victims to Appellant and Appellant's seemingly uncontrollable outbursts of anger. And the evidence would not fall under the limited applicability of the "greater latitude" rule announced in *Myers v. State,* 2000 OK CR 25, ¶ 24, 17 P.3d 1021, 1030. We have applied that "rule" only in sexual abuse cases and would not have been particularly interested in expanding its application further.[2]

■ ¶ 16 As for the remaining exception applied by the Court, "absence of mistake or accident," Appellant raises two arguments. First, he claims that he presented no testimony or evidence in his defense, did not testify himself, and otherwise made no affirmative attempt to argue or show that the injuries inflicted upon his daughter were accidental. Moreover, he points out that the State medical examiner testified that the injuries were not the result of an accident, but were the result of tremendous deliberate force. Thus, Appellant essentially argues that the use of this exception depends on a defendant's affirmative claim of accident as a would-be excuse and that it is inapplicable

2. Appellant's brief states that this Court has "allowed such evidence more liberally in child abuse cases . . . to allow the State to rebut assertions of mistake or accident. *See, e.g., Revilla v. State,* 1994 OK CR 24, 877 P.2d 1143; *Freeman v. State,* 1984 OK CR 60, 681 P.2d 84; *White v. State,* 1980 OK CR 10, 607 P.2d 713; *Ashford v. State,* 1979 OK CR 138, 603 P.2d 1162." But these are his words, not ours, and the cases cited speak for themselves on how we have applied this particular exception in past cases. Moreover, the fact that the trial court did not base its decision on *Myers* makes the fact that a majority of this Court recently overruled the *Myers* greater latitude rule in *James v. State,* 2007 OK CR 1, ¶ 4, 152 P.3d 255, 257 irrelevant.

when a defendant stands mute. Or, at least, that when a defendant makes no claim of accident, then the probative value of the prior crime character evidence necessarily decreases, and the would-be prejudicial effect of admitting it increases.

¶ 17 These are interesting arguments with at least some logical merit. Unfortunately, Appellant provides no supporting citation to bolster his argument, except for some cases that stand for the proposition that the more similar the prior crime is to the instant one, the more the possible prejudice.

¶ 18 Appellant's second argument is that the State went beyond the limited purpose upon which such evidence could be properly considered by a jury. That is, the State emphasized it repeatedly in an effort to drive home the action in conformity therewith idea to jurors.

¶ 19 Turning to the evidence in this case, we have a defendant who initially told authorities that on the night in question he went to calm his crying infant without any particular untoward incident occurring. Even after his wife informed him the child didn't look right, Appellant remained calm, saying she looked fine. When the child began having trouble breathing, Appellant performed CPR and instructed his wife to call 911. When Appellant was later confronted with the autopsy results and placed under arrest, however, he admitted he'd grabbed the child by the legs as she was lying on her stomach and flipped her over backwards. As he told this story on videotape, Appellant began sobbing and admitted his actions caused the death.

¶ 20 Appellant's admission and explanation of the events in question would not necessarily remove the issue of accident or mistake

from the mix, i.e., whether Appellant's actions in flipping the child over in the way he did were either grossly miscalculated or horribly executed. Given Appellant's interview demeanor, a juror might have concluded that Appellant's actions were more a matter of ignorance than they were of deliberate and malicious conduct.

¶ 21 In this particular type of case, where a specific intent to kill is not required, but only the malicious or willful use of unreasonable force against a child under 18,[3] we cannot say the trial judge abused his discretion in allowing the evidence under the exception.[4] Moreover, we find several instances in the record where the defense did in fact raise the issue of accident, through argument and cross-examination. Thus, Appellant's arguments that he made no affirmative attempt to present an accident defense are somewhat exaggerated.

¶ 22 Besides, the State is the first to present its case and, in so doing, often never knows whether or not a defendant will ultimately take the stand and claim his or her actions were accidental. The State must anticipate the defense, to a certain degree.

¶ 23 The better issue is whether the State exceeded the scope of this evidence when presenting it at trial. For the evidence, although ruled admissible, was still only ruled admissible for a limited purpose, i.e., to discredit any assertions or evidence of accident or mistake.[5] (The jury was, in fact, instructed that the evidence could only be considered for this limited purpose.)

¶ 24 Reviewing the record, the State unquestionably focused a lot of its attention at trial on this prior crime, referring to it in opening statements, in questioning three witnesses,[6] and in closing arguments. The

---

3. OUJI–CR 2d 4–65A.

4. In so ruling, we necessarily find the probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice...." 12 O.S.Supp.2003, § 2403.

5. Appellant argues that jurors, upon hearing such evidence, "cannot reasonably be expected to separate out the legal niceties and apply such evidence for a narrow purpose such as to rebut any inference of mistake or accident." We agree that this particular exception has unique propen-

sity implications under the facts of this case. However, we view this more as a matter of discrediting a defense than proving action in conformity with past character. Appellant's own admissions and the circumstances of his actions are much more damning than any inferences made from his prior crime.

6. The State went so far as to call a witness from California who had investigated the prior crime years ago, asking him about the facts of that case.

State exceeded the limited scope for which such evidence may be properly considered, at least under the court's rulings.

¶ 25 But to a certain extent, the admission of this evidence was inextricably intertwined with the State's investigation of the case and connected to its burden of proof,[7] for some of the evidence demonstrated how Appellant's past conduct caused authorities to respond in a certain way. *See Jones v. State,* 2006 OK CR 5, ¶ 48, 128 P.3d 521, 540 (discussing how some prior crimes evidence incidentally emerges). Even more importantly, some of this evidence went to intent, another exception found in 2404(B), for the State had to prove that Appellant willfully or maliciously used unreasonable force. That is, the State had to prove Appellant intended to use more force than was reasonable under the circumstances or, alternatively, that the amount of force was malicious insofar as showing a wish to injure. OUJI–CR 2d 4–40D.

¶ 26 Considering the limiting instruction and the matter of intent, the portions of this evidence that was closely connected to the police investigation and that which discredited claims of accident, we find this evidence was admissible in the first stage and was not used improperly by the State.

■ ¶ 27 In proposition three, Appellant claims the admission of three gruesome autopsy photographs at trial deprived him of his Constitutional right to a fundamentally fair trial pursuant to the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7 and 9 of Oklahoma's Constitution. These three autopsy photos were admitted over defense objections that they were unfairly prejudicial, cumulative, and depictions of the medical examiner's handiwork—and in spite of the trial court's own concerns that they are gruesome. Additionally, another photo was admitted of the deceased child as she lay on the autopsy table, but before any procedures were performed.

¶ 28 The State, on the other hand, claims the photographs were corroborative, rather than cumulative, to the medical examiner's testimony. The State also sets forth the general rule that admission of evidence lies within the sound discretion of the trial court "whose rulings will not be disturbed unless that discretion is clearly abused, resulting in manifest prejudice to the accused." *Davis v. State,* 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79.

¶ 29 The issue of gruesome photographs has been discussed by this Court in case after case, and the issues relating thereto are well known. As we have said before, "Gruesome crimes result in gruesome pictures." *Patton v. State,* 1998 OK CR 66, ¶ 60, 973 P.2d 270, 290. On the other hand, post-autopsy photographs have often been found to be inadmissible by this Court on the basis that their probative value was substantially outweighed by prejudicial effect due to their shocking nature and tendency to focus on the handiwork of the medical examiner, rather than the defendant. *See, e.g., Wilson v. State,* 1998 OK CR 73, ¶ 92, 983 P.2d 448, 468; *Sattayarak v. State,* 1994 OK CR 64, ¶ 8, 887 P.2d 1326, 1330; *Oxendine v. State,* 1958 OK CR 104, ¶¶ 6–8, 335 P.2d 940, 942–43.

¶ 30 Here, the photos at issue fall squarely on the line between what is relevant and what is prejudicial. The photos at issue are extremely grotesque, the sort of pictures that we would all like to avoid in our lives. However, this was an extremely brutal crime, one that can fairly be described as a grown man breaking a helpless child in half. The nature of those injuries, unlike most first degree murders, was hidden inside the child's body. Indeed, medical personnel attempting to rescue the child's life were unaware of the precise nature of the injury until an autopsy was performed.

---

7. The record indicates that child welfare authorities were monitoring the family after Brianna's birth, due to Appellant's history of child abuse. This history played a part in the early investigations into Brianna's death, i.e., officers were quickly made aware of Appellant's history via child welfare workers, thought it raised red flags, and questioned him about it on the same day that Brianna was killed. Thus, the investigations were in part triggered or hastened by Appellant's abusive history, and it would have been difficult if not impossible to completely extract this portion of the investigational motives from the trial. In other words, the prior crimes evidence was so connected to the crime in question that it cannot be fairly separated from the crimes charged.

¶ 31 The photos did not show crude Frankenstein stitching, but instead focused on close up shots of the victim's wounds, i.e., the broken spine and separated aorta, after the medical examiner had done what was necessary in order to reveal them. We think two of these shots, rather than three, would have sufficed, given the fact that Appellant admitted being the cause. One photo (State's Exhibit 7) focused on the injury to the spine while another (State's Exhibit 9) focused on the aorta. State's Exhibit 8 was fairly redundant as to the injuries and gruesomeness. But we also note that these three shots were clearly preferable to others that were curiously proffered by the State, but denied admission by the Court.

 ¶ 32 Still, the State had to prove a willful or malicious use of unreasonable force by the defendant, and therefore it was important for the jury to consider fully the force applied by Appellant's actions. When speaking of malice and unreasonableness, pictures are worth much more than words. We find, therefore, the trial judge did not abuse his discretion in admitting two of these photos in the first stage.[8] Moreover, we find a lack of first stage prejudice regarding the admission of the other photo, given Appellant's admissions of responsibility. We withhold judgment, however, regarding what inflammatory impact this additional photo may have had on sentencing until our review of proposition twelve, cumulative error, and later in our mandatory sentence review.

### SENTENCING STAGE ISSUES

¶ 33 In proposition six, Appellant claims his jury was given an erroneous instruction regarding the "heinous, atrocious, or cruel" aggravating circumstance which rendered his sentencing proceeding constitutionally invalid. That is, Appellant received an older version of the "especially heinous, atrocious, or cruel" instruction, rather than the modified version announced in *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156. Appellant also claims the evidence was insufficient

to support this aggravating circumstance. And finally, he claims that this aggravating circumstance is unconstitutionally vague and overbroad as it is being applied by this Court, thus violating Appellant's rights pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, Section 7 of Oklahoma's Constitution.

 ¶ 34 The first question raised above was previously answered by this Court in *Browning v. State*, 2006 OK CR 8, ¶ 53, 134 P.3d 816, 844. There, we noted that in *DeRosa*, "to forestall any such claim," we had specifically stated otherwise, then quoted the following *DeRosa* language:

This instruction does not change any of the legal requirements of the "heinous, atrocious, or cruel" aggravating circumstance as it has existed up until this time.... This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate, and this Court does not hold thus. Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis. Such cases will be evaluated in the same manner as they have been in the past.

*Browning*, 2006 OK CR 8, ¶ 53, 134 P.3d at 844. As we stated in *Rojem v. State*, 2006 OK CR 7, ¶ 70–71, 130 P.3d 287, 301, "[T]he instruction *more fully* informs and acts as a form of insurance. But this does not mean the former instruction has suddenly become unconstitutional."

¶ 35 Appellant puts a different spin on this argument, however, claiming he was denied an important right conferred by *DeRosa* and, consequentially, the trial judge, the prosecutors as officers of the court, and his own attorneys through ineffective assistance collectively denied him the right to a fair trial by failing to assure his jury received the *DeRosa* instruction.

 ¶ 36 We acknowledge the *DeRosa* instruction is an improved version of the former instruction and that we mandated its

---

8. The fourth photo, a picture of Brianna's face and upper torso after she had died but before the autopsy began had no particular relevance and should not have been admitted. But at the same time, the photo was not really prejudicial either, and we decline to grant any relief with respect to it.

use in capital trials approximately six months prior to the time Appellant's jury received its instructions. But every mistake in a capital trial does not amount to reversible error. As we have stated before, no criminal trial is perfect. Our adversarial system grants both sides an advocate to prove their case, to urge their positions, to prevent the opposing side from trampling on their rights. A capital trial requires thousands of decisions, maneuvering through law and paperwork and witnesses and evidence on a daily basis. Here, the collective failure to read the latest case handed down on the instruction for this particular aggravating circumstance—an instruction that had yet to appear in the modified OUJI instructions—was a mistake, but the possible impact on the fairness of Appellant's trial was, in our opinion, slight at best. Because the former instruction is constitutionally acceptable, we cannot grant relief on this issue, standing alone. However, we will consider it again when reviewing proposition twelve, cumulative error, and later during our mandatory sentence review.

¶ 37 As for the third argument Appellant raises in this proposition—that our construction of this aggravating circumstance is overly broad and unconstitutionally vague—we note that this issue is raised in virtually every capital murder trial where the especially heinous, atrocious, or cruel aggravating circumstance is at issue. We have repeatedly rejected such claims, however, and see no reason to do otherwise here. *See Rojem,* 2006 OK CR 7, ¶ 73, 130 P.3d at 301; *Thacker,* 2004 OK CR 32, ¶ 26, 100 P.3d 1052, 1058; *Lockett v. State,* 2002 OK CR 30, ¶ 40, 53 P.3d 418, 430; *Le v. State,* 1997 OK CR 55, ¶¶ 41–45, 947 P.2d 535, 552–53, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). *See also Hooker v. State,* 1994 OK CR 75, ¶ 44, 887 P.2d 1351, 1364–65, *cert. denied,* 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); *Revilla v. State,* 1994 OK CR 24, ¶ 42, 877 P.2d 1143, 1154–55, *cert. denied,* 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Berget v. State,* 1991 OK CR 121, ¶¶ 29–34, 824 P.2d 364, 372–74, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). In each of these cases we found the instruction given regarding the especially heinous, atrocious, or cruel aggra-

vating circumstance sufficiently narrowed its application and passed constitutional muster.

 ¶ 38 We now turn to Appellant's second argument, that the evidence supporting this particular aggravator is insufficient. The evidence on this point is somewhat brief and circumstantial. Therefore, the question of whether the evidence admitted at trial was sufficient for the jury's finding that the murder was preceded by torture of the victim or serious physical abuse is one worthy of considerable deliberation.

¶ 39 Appellant admitted his part in the crime, although his explanation was brief and lacking in helpful details. Appellant originally told authorities that Brianna was crying. Appellant's wife was doing laundry, so he went in to calm her, then went back to playing video games. Later, he described similar events, although on this occasion Appellant did not mention going in to calm his daughter. Rather, his wife noticed she didn't look right, and Appellant came in, looked her over, and said she was fine. Appellant even wrote a statement of this version of the events on the night of the murder, State's Exhibit 1.

¶ 40 The next day, however, authorities first confronted Appellant with the medical examiner's ruling that the death was by homicide. Appellant's first words were, "How many years am I looking at?", thus demonstrating guilty knowledge. Appellant then told a revised version of his story—that he had attempted to get Brianna to stop crying, but she wouldn't; that he then grabbed his daughter by her ankles while she was lying on her stomach, then pushed her legs towards her head, until she flipped over. The testifying officer, while recounting Appellant's version of the events, physically demonstrates how this was accomplished, but our written record does not adequately reflect what occurred. But after he did this, Brianna stopped crying, at some point. Appellant's wife then returned to the room to find Brianna not looking right, and the rest of the events are similar to Appellant's previous explanations.

¶ 41 Appellant also wrote out a statement after this interview, State's Exhibit 2. There-

in, he states, "Brianna was crying so I went into the room to flip her over by grabbing her by the leg and flipping her over backwards." His wife did not reenter the room for ten to fifteen minutes after the fatal actions.

¶ 42 A fair reading of this record, however, is consistent with the State's description, that Appellant forcefully folded his daughter over until her spine snapped and her aorta tore.

¶ 43 The medical examiner testified that the autopsy revealed Brianna's lumbar spine, the lower part of her back, had been "broken and was splayed open in the front...." Also, Brianna suffered a "complete tear or what we call a transaction or laceration of the aorta ... an aorta which is completely torn into two pieces." The breaking of the spine "can really only occur when there's what we call hyperextension or a bending backward of the back such that it snaps open. And this doesn't occur with normal bending, but would only occur with ... abnormal bending backward of the back." The medical examiner further testified that the injury would take a "great amount of force and a deliberate force." And the aorta was not severed by the bone breaking. The medical examiner testified that it is elastic like a rubberband and had been stretched and stretched and stretched until it finally passed the breaking point. His conclusion, then, was that "we're talking about basically folding the back in half." [9]

¶ 44 The medical examiner testified that this injury would "absolutely" be painful to a nine-month-old child. Moreover, he stated "[t]here's no unconsciousness would occur instantaneously ... It takes a little bit of time for enough blood to leave the vessels and not feed the brain before one becomes unconscious with an injury like that...." The medical examiner testified that the child was probably conscious for no more than 30 seconds after the spine snapped and that she probably died within two or three minutes.

¶ 45 And so, we have a crying child who is essentially snapped in two by great force at the hands of her father. She was alive when the painful force was applied and she continued to feel pain for another thirty seconds afterward until she went unconscious and then expired a few minutes later. The amount of force required was great and the stretching before the breaking of the spine and tearing apart of the aorta would have been protracted and not instantaneous.

 ¶ 46 The especially heinous, atrocious, or cruel aggravator requires a finding of torture or great physical abuse. In the *DeRosa* instruction, torture is further qualified as requiring the infliction of "great physical anguish or extreme mental cruelty" and "serious physical abuse" and "great physical anguish" are further qualified as requiring the victim to experience "conscious physical suffering."

¶ 47 While Brianna Cole suffered a fairly quick death, it was far from painless. Indeed, the pain was likely excruciatingly horrible. One cannot read this chilling record without concluding that Brianna suffered both torture and serious physical abuse at the hands of Appellant. She experienced a heinous death with great conscious suffering to a degree unlike "virtually all murders," thereby placing this crime within the narrowed class of individuals for which capital punishment is a valid option. Accordingly, we find the evidence admitted at trial, when viewed in a light most favorable to the State, was sufficient to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel. *Black v. State,* 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074; *Malicoat v. State,* 2000 OK CR 1, ¶ 16, 992 P.2d 383, 397, *cert. denied* 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000).

¶ 48 Appellant's last argument concerning this aggravator—that the "duplicative elements of the crime of child abuse mimic the legal requirements for the 'heinous, atrocious, or cruel' aggravating circumstance and thus Oklahoma's first degree murder statute does not constitutionally narrow the class of murderers who are subject to the death penalty"—was previously studied and rejected

---

9. This testimony makes the autopsy photographs highly probative to show both cause of death and the conscious physical suffering required by the especially heinous, atrocious, or cruel aggravator.

by this Court in *Malicoat*, 2000 OK CR 1, ¶¶ 24–25, 992 P.2d at 399–400.[10] We do so again here for the same reasons.

¶ 49 In proposition eight, Appellant claims the introduction of the details of his prior conviction during the first stage proceedings prejudiced him during the penalty phase proceedings and resulted in a death sentence obtained in violation in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7 and 9 of Oklahoma's Constitution. More specifically, Appellant claims under *Brewer v. State*, 1982 OK CR 128, ¶¶ 41–42, 650 P.2d 54, 63 that he had the right to stipulate that his prior felony conviction (as alleged by the State) involved the use or threat of violence, thereby avoiding prejudicial details of the prior crime.

 ¶ 50 But, as the State correctly points out, this rule does not come into play when the State also alleges the continuing threat aggravating circumstance, as was the case here. When the State alleges both of these aggravators, "the jury is entitled to have before it all possible relevant information about the individual defendant whose fate it must determine." *Smith v. State*, 1991 OK CR 100, ¶ 29, 819 P.2d 270, 277. Although jurors acquitted Appellant of the continuing threat aggravator, the evidence would have come in during second stage. (Moreover, we have already determined there was no error in considering this evidence during the first stage.) Therefore, Appellant's claim in this proposition fails.

¶ 51 In propositions seven, nine, ten, and eleven, Appellant raises claims that are raised by nearly all capital defendants as a matter of course. Each of these claims has been repeatedly rejected by this Court for various reasons.

¶ 52 We thus reject each of these claims in accordance with our previous decisions, as follows: proposition seven—that the status of Oklahoma's crime of child abuse murder as one of general intent fails to provide a constitutionally adequate culpability requirement that must result in vacature of the death sentence in this case as having been imposed in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 11, Section 7 and 9 of Oklahoma's Constitution;[11] proposition nine—that the introduction of a full color photograph of the minor decedent depicting her in life (in a staged portrait setting) during penalty phase proceedings violated Appellant's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article 11, Section 7 of Oklahoma's Constitution, and his right to be free of *ex post facto* laws;[12] proposition ten—that the second stage jury instructions on the definition of mitigating evidence deprived Appellant of a fundamentally fair sentencing proceeding in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 11, Section 7 and 9 of Oklahoma's Constitution;[13] and proposition eleven—that Appellant was denied his constitutional right to jury trial by the failure of the trial court to instruct the jury that it must find that the aggravating circumstances outweighed the mitigating evidence beyond a reasonable doubt in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[14]

## ISSUES RELATING TO BOTH STAGES

¶ 53 In proposition five, Appellant claims prosecutorial misconduct in seeking sympathy for the decedent violated his right to a

---

10. As previously and subsequently reflected, the Supreme Court has twice declined certiorari with respect to *Malicoat*.

11. *Malicoat*, 2000 OK CR 1, ¶ 15, 992 P.2d at 396; *Malicoat v. Mullin*, 426 F.3d 1241, 1254–55 (10th Cir.2005) *cert. denied*, —— U.S. ——, 126 S.Ct. 2356, 165 L.Ed.2d 283 (2006); *Workman v. Mullin*, 342 F.3d 1100, 1114 (10th Cir.2003).

12. *Hogan v. State*, 2006 OK CR 19, ¶ 61, 139 P.3d 907, 930. *Hogan* does not overtly address

the Constitutional sections referenced above by Appellant; however, it does speak of the general constitutionality of the amendments to 12 O.S.Supp.2002, § 2403, which actually went into effect about a month *before* this particular crime was committed.

13. *Rojem*, 2006 OK CR 7, ¶¶ 57–58, 130 P.3d at 299.

14. *Id.*, 2006 OK CR 7, ¶¶ 59–60, 130 P.3d at 299.

fundamentally fair trial and sentencing proceeding in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, Sections 7 and 20 of Oklahoma's Constitution.

¶ 54 Appellant points to four brief examples from the nine-day trial. First, during first stage opening statement the prosecutor made two references about the death occurring just prior to what would have been Brianna's "first Christmas." No objection was made to the comment, and we find no error, plain or otherwise. The occurrence of this murder on the week before Christmas is a tragic circumstance that is instantaneously obvious to everyone, this Court included. Certain facts simply cannot be disentangled from a criminal trial on the basis that they also evoke sympathy.

¶ 55 Next, Appellant points to first stage closing arguments, when the prosecutor argued that children are a blessing, one that most parents, grandparents, etc. would give anything for and value highly. No objection was made, however, and for good reason. These comments fall within the wide latitude of discussion permitted both the state and the defense in closing argument. *Short v. State,* 1999 OK CR 15, ¶ 72, 980 P.2d 1081, 1104.

¶ 56 Next, Appellant points to brief comments at the end of first stage closing arguments when the prosecutor argued that children are a precious gift, entrusted to parents by God. Again, no objection was raised, and we find no plain error. *Simpson v. State,* 1994 OK CR 40, ¶ 2, 876 P.2d 690, 692–93. It is probably safe to say that most Americans, probably a strong majority, would agree with this statement wholeheartedly. While the statement is perhaps objectionable, as possibly injecting God into the mix and for its intentional melodrama, it does not, standing alone, amount to plain error.

¶ 57 Appellant's last example, which occurred during the prosecutor's penalty phase closing, concerns the prosecutor's story of how his father told him that a "baby's cry is God asking you to help them," along with a later reference to an earlier unobjected to description of the victim as God's gift.

No objections were made by defense counsel. Again, we find no plain error. While the sentimental statement above were, in our opinion, slightly beyond that "wide latitude" given to parties to discuss the evidence and make reasonable arguments therefrom, Appellant's trial or sentencing was not rendered unfair by these last remarks, or when all of the examples are considered together. The record indicates that Appellant was himself responsible for injecting religion into this trial by his bizarre behavior, so much so that his counsel, at times, had to do their best to convince jurors that Appellant was simply a devout man, rather than a troubling zealot. In context, then, the prosecutors' brief arguments about God were no more than an adversarial balance to Appellant's positions on religion.

¶ 58 In his twelfth proposition, Appellant claims the cumulative effect of the errors raised in this appeal denied him a fundamentally fair trial. We have found only arguably improper argument relating to first stage that need be considered in this proposition. The argument was not objected to and did not amount to plain error. Therefore, we find no cumulative error impacting the jury's decision on guilt/innocence.

¶ 59 With respect to the second stage, we found only one photograph that was potentially prejudicial as to second stage. We have also found that Appellant was not given the benefit of the improved *DeRosa* instruction, even though the former instruction that he received was constitutionally adequate. We have also found two brief arguments made by counsel (the first stage argument referenced in the prior paragraph and then one occurring in second stage closing) that were not objected to and which served to balance some of the religion injected into this trial by Appellant.

¶ 60 Overall, then, we cannot say that the cumulative impact of these fairly minor trial errors could have conceivably impacted the sentencing decision in any way. Therefore, we decline to grant relief.

### MANDATORY SENTENCE REVIEW

¶ 61 Pursuant to 21 O.S.2001, § 701.13(C) and in response to Appellant's

final arguments in proposition thirteen, we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances set forth in 21 O.S.2001, § 701.12.

¶ 62 Turning to the second portion of this mandate, the jury found the existence of two aggravating circumstance: (1) that Appellant had been previously convicted of a felony involving the use or threat of violence to the person; and (2) that the murder was especially heinous, atrocious, or cruel. We have found sufficient evidence to support the second aggravating circumstance, and Appellant has raised no meaningful appellate challenge to the first, which we find is also supported by the record in regard to Appellant's abuse of another of his children years ago.

¶ 63 The following mitigating evidence was presented by Appellant: Appellant was sexually molested as a child; that Appellant has brain damage; that the Appellant confessed to the crime; that Appellant expressed remorse; that Appellant has intermittent explosive personality disorder; that Appellant has a personality disorder not otherwise specified; that Appellant is an alcoholic; that Appellant's life is valued by his family; that Appellant is devoutly religious; that Appellant is unlikely to be violent in a prison setting or outside of a domestic relationship; that Appellant does well in a structured prison setting. In addition to this, we have Appellant attempting to conduct CPR on the victim after the incident. Brianna had been taken in for regularly scheduled post-natal checkups before the incident, accompanied by both parents. Appellant's first wife described Appellant as a perfect husband, until he became involved with the wrong people and drinking. Appellant's step-brother described a poor domestic situation growing,

whereby Appellant regularly "huffed" gasoline. As to the aforementioned sexual molestation Appellant suffered through as a child, testimony was introduced that it was at the hands of a close male friend of Appellant's father and that Appellant's father did not believe him or support him with respect to the allegations when they were revealed.

¶ 64 In addition to this mitigating evidence and the aggravating evidence discussed previously in this opinion, other witnesses described violent outbursts of anger by Appellant against his former wife and his children.

¶ 65 Upon review of the record and after carefully weighing the aggravating circumstance and the mitigating evidence, along with the errors alleged in this appeal, we find the sentence of death to be factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.[15]

## DECISION

¶ 66 The judgment and sentence are hereby **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J. and A. JOHNSON, J.: concur.

CHAPEL and LEWIS, JJ.: concur in result.

---

**15.** In a post-briefing "notice," Appellant claims the holding of *Anderson v. State,* 2006 OK CR 6, 130 P.3d 273 should apply to this case and that Appellant should have received an instruction concerning the fact that a person given a life sentence would be required to serve 85% of his sentence before becoming eligible for parole. We find, however, that no relief is required in the instant case, however, as Appellant's jury was

aware that they had three sentencing options: death, life without the possibility of parole; and life with the possibility of parole. The jury determined that death was the appropriate sentence, thereby rejecting a sentence that would keep Appellant in prison with no possibility of parole. The absence of an *Anderson* instruction, therefore, did not prejudice Appellant, and any error was harmless.