COLE v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:COLE v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 COLE v. STATE
2021 OK CR 10
Case Number: PCD-2020-529
Decided: 04/29/2021
BENJAMIN ROBERT COLE, SR., Petitioner v. STATE OF OKLAHOMA, Respondent.

Cite as: 2021 OK CR 10, __ __

 

OPINION GRANTING POST-CONVICTION RELIEF
LUMPKIN, JUDGE:
[1] 
¶1 Benjamin Robert Cole, Sr., was tried by jury and convicted of First Degree Murder in the District Court of Rogers County, Case No. CF-2002-597. In accordance with the jury's recommendation the Honorable J. Dwayne Steidley sentenced Petitioner to death. Petitioner appealed his conviction and sentence in Case No. D-2004-1260, but this Court denied relief. Cole v. State, 2007 OK CR 27, 164 P.3d 1089. Petitioner previously sought post-conviction relief and was denied the same by this Court. See Cole v. State, Case No. PCD-2005-23 (Okl.Cr. Jan. 24, 2008) (unpublished) and Cole v. State, Case No. PCD-2020-332 (Okl.Cr. May 29, 2020) (unpublished). For the third time, Petitioner seeks post-conviction relief from this conviction and sentence, challenging the jurisdiction of Rogers County to try him for his infant daughter's heinous murder.

¶2 In his sole proposition, Petitioner claims the District Court of Rogers County lacked jurisdiction to try him. Appellant argues that his daughter, B.C., had some quantum of Cherokee blood and her murder occurred within the boundaries of the Cherokee Nation.
¶3 Pursuant to McGirt v. Oklahoma, 591 U.S. __, 140 S. Ct. 2452 (2020), Appellant's claim raises two separate questions: (a) the victim's Indian status and (b) whether the crime occurred in Indian Country. Because these issues require fact-finding, we remanded this case to the District Court of Rogers County for an evidentiary hearing.
¶4 Recognizing the historical and specialized nature of this remand for evidentiary hearing, we requested the Attorney General and District Attorney work in coordination to effect uniformity and completeness in the hearing process. Upon Petitioner's presentation of prima facie evidence as to the victim's legal status as an Indian and as to the location of the crime in Indian Country, the burden would shift to the State to prove it has subject matter jurisdiction. The District Court was ordered to: determine whether the victim has some Indian blood and is recognized as an Indian by a tribe or the federal government and to determine whether the crime occurred in Indian Country. The District Court was directed to follow the analysis set out in McGirt to find (1) whether Congress established a reservation for the Cherokee Nation, and (2) if so, whether Congress specifically erased those boundaries and disestablished the reservation. In so doing, the District Court was directed to consider any evidence the parties provided, including but not limited to treaties, statutes, maps, and/or testimony.
¶5 We also directed the District Court that in the event the parties agreed as to what the evidence would show with regard to the questions presented, the parties could enter into a written stipulation setting forth those facts upon which they agree and which answer the questions presented and provide the stipulation to the District Court. The District Court was also ordered to file written findings of facts and conclusions of law with this Court.
¶6 The Honorable Kassie N. McCoy, Associate District Judge, held an evidentiary hearing in this case, and an Order on Remand from that hearing was timely filed with this Court. The record indicates that appearing before the District Court were attorneys from the office of the Attorney General of Oklahoma, the Rogers County District Attorney's Office, the Federal Public Defender's Office for the Western District of Oklahoma, and the office of the Attorney General of the Cherokee Nation.
¶7 In its Order on Remand, regarding whether the crime occurred in Indian country, the Order states that the State of Oklahoma and Petitioner stipulated that the crime occurred "within the geographic area set out in the Treaty with the Cherokee, December 29, 1835, 7 Stat. 478, as modified under the Treaty of July 19, 1866, 14 Stat. 799, and as modified under the 1891 agreement ratified by Act of March 3, 1893, 27 Stat. 612." The Order also states that "the State takes no position as to the facts underlying the existence, now or historically, of the alleged Cherokee Nation Reservation."
¶8 The District Court's Order on Remand further states that the State of Oklahoma and Petitioner "stipulated to B.C.'s Indian status by virtue of her tribal membership
[2] and proof of blood quantum." Further, "[b]ased upon the stipulations provided, the Court specifically finds B.C. (1) had some Indian blood and (2) was recognized as an Indian by a tribe or the federal government."
¶9 In determining whether Congress established a reservation for the Cherokee Nation, the District Court found:
1. The Cherokee Nation is a federally recognized Indian tribe. 84 C.F.R. § 1200 (2019).
2. The current boundaries of the Cherokee Nation encompass lands in a fourteen-county area within the borders of the State of Oklahoma, including all of Adair, Cherokee, Craig, Nowata, Sequoyah, and Washington Counties, and portions of Delaware, Mayes, McIntosh, Muskogee, Ottawa, Rogers, Tulsa and Wagoner Counties. 

3. The Cherokee Nation's treaties are to be considered on their own terms, in determining reservation status. McGirt v. Oklahoma, 140 S. Ct. 2452 (2020).

4. In McGirt the United States Supreme Court noted that Creek treaties promised a "permanent home" that would be "forever set apart" and assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state. McGirt, 140 S. Ct. at 2451-62. As such, the Supreme Court found that "Under any definition, this was a [Creek] reservation." Id., 140 S. Ct. at 2461.

5. The Cherokee treaties were negotiated and finalized during the same period of time as the Creek treaties, contained similar provisions that promised a permanent home that would be forever set apart, and assured a right to self-government on lands that lie outside both the legal jurisdiction and geographic boundaries of any state.
6. The 1833 Cherokee treaty "solemnly pledged" a "guarantee" of seven million acres to the Cherokee on new lands in the West "forever." Treaty with the Western Cherokee, Preamble, Feb. 14 1833, 7 Stat. 414.

7. The 1833 Cherokee treaty used precise geographic terms to describe the boundaries of the new Cherokee lands, and provided that a patent would issue as soon as reasonably practical. Art. 1, 7 Stat. 414.

8. The 1835 Cherokee treaty was ratified two years later "with a view to re-unite their people in one body and to secure to them a permanent home for themselves and their posterity," in what became known as Indian Territory, "without the territorial limits of the state sovereignties," and "where they could establish and enjoy a government of their choice, and perpetuate such a state of society as might be consonant with their views, habits and condition." Treaty with the Cherokee, Dec. 29, 1835, 7 Stat. 478 and Holden v. Joy, 84 U.S. 211, 237-38 (1872).

9. Like the Creek treaty promises, the United States' treaty promises to the Cherokee Nation "weren't made gratuitously." McGirt, 140 S. Ct at 2460. Under the 1835 treaty, Cherokee Nation "cede[d], relinquish[ed], and convey[ed]" all its aboriginal lands east of the Mississippi River to the United States. Arts 1, 7 Stat. 478. In return the United States agreed to convey to the Cherokee Nation, by fee patent, seven million acres in Indian Territory within the same boundaries as described in the 1833 treaty, plus "a perpetual outlet west." Art 2, 7 Stat. 478. 
10. The 1835 Cherokee treaty described the United States' conveyance to the Cherokee Nation of the new lands in Indian territory as a cession; required Cherokee removal to the new lands; covenanted that none of the new lands would be "included within the territorial limits or jurisdiction of any State or Territory" without tribal consent; and secured "to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government . . . within their own country," so as long as they were consistent with the Constitution and laws enacted by Congress regulating trade with Indians. Arts. 1, 5, 8, 19, 7 Stat. 478. 
11. On December 31, 1838, President Van Buren executed a fee patent to the Cherokee Nation for the new lands in Indian Territory. Cherokee Nation v. Hitchcock, 187 U.S. 294, 297 (1902). The title was held by the Cherokee Nation "for the common use and equal benefit of all the members." Hitchcock, 187 U.S. at 307; see also Cherokee Nation v. JourneyCake, 155 U.S. 196, 207 (1894). Fee title is not inherently incompatible with reservation status, and establishment of a reservation does not require a "particular form of words." McGirt, I40 S. Ct. at 2475, citing Masey v. Wright, 54 S.W. 807, 810 (Indian Ter. 1900) and Minnesota v. Hitchcock, 185 U.S. 373, 390 (1902).

12. The 1846 Cherokee treaty required federal issuance of a deed to the Cherokee Nation for lands it occupied, including the "purchased" 800,000-acre tract in Kansas (known as the Neutral Lands) and the "outlet west." Treaty with the Cherokee, Aug. 6, 1846, art. 1, 9 Stat. 871.

13. The 1866 Cherokee treaty resulted in Cherokee cessions of lands in Kansas and the Cherokee Outlet and required the United States, at its own expense, to cause the Cherokee boundaries to be marked "by permanent and conspicuous monuments by two commissioners, one of whom shall be designated by the Cherokee national council." Treaty with the Cherokee, July 19, 1866, art. 21, 14 Stat. 799. 
14. The 1866 Cherokee treaty "re-affirmed and declared to be in full force" all previous treaty provisions "not inconsistent with the provisions of" the 1866 treaty and provided that nothing in the 1866 treaty "shall be constructed as an acknowledgment by the United States or as relinquishment by Cherokee Nation of any claims or demands under the guarantees of former treaties," except as expressly provided in the 1866 treaty. Art 31, 14 Stat. 799.
15. Under McGirt the "most authoritative evidence of [a tribe's] relationship to the land . . . lies in the treaties and statutes that promised the land to the Tribe in the first place." McGirt, 140 S. Ct. at 2476.
¶10 The District Court found that "[a]s a result of the treaty provisions referenced above and related federal statutes . . . Congress did establish a Cherokee Reservation as required under the analysis set out in McGirt."
¶11 Further, regarding whether Congress specifically erased the boundaries or disestablished the Cherokee Reservation, the District Court found:
1. The current boundaries of the Cherokee Nation are as established in Indian Territory in the 1833 and 1835 Cherokee treaties, diminished only by two express cessions. 
2. First the 1866 treaty expressly ceded the Nation's patented lands in Kansas, consisting of a two and one half mile wide tract known as the Cherokee Strip and the 800,000-acre Neutral Lands, to the United States. art. 17,14 Stat. 799
3. Second the 1866 treaty authorized settlement of other tribes in a portion of the Nation's land west of its current western boundary (within the are known as the Cherokee Outlet); and required payment for those lands, stating that the Cherokee Nation would "retain the right of possession of and the jurisdiction over all said country . . . until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever as to each of said districts thus sold and occupied." art. 16, 14 Stat. 799.
4. The Cherokee Outlet cession was finalized by an 1891 agreement and ratified by Congress in 1893 (1891 Agreement). Act of Mar. 3, 1893, Ch. 209, § 10, 27, Stat. 612, 640-43.
5. The 1891 Agreement provided that the Cherokee nation "shall cede and relinquish all its title, claim, and interest of every kind and character in and to that part of the Indian Territory" encompassing a strip of land bounded by Kansas on the North and the Creek Nation on the south, and located between the ninety-sixth degree west longitude and the one hundredth degree west longitude (i.e., the Cherokee Outlet). See United States v. Cherokee Nation, 202 U.S. 101, 106-107 (1906).
6. The 1893 statute that ratified the 1891 Agreement required payment of a sum certain to the Nation and provided that, upon payment, the ceded lands would "become and be taken to be, and treated as, a part of the public domain," except for such lands allotted under the Agreement to certain described Cherokees farming the lands. 27 Stat. 612, 640-43; United States v. Cherokee Nation, 202 U.S. at 112.
7. Cherokee Nation did not cede or restore any other portion of the Cherokee Reservation to the public domain in the 1891 Agreement. No evidence was presented that any other cession has occurred since that time.
8. The original 1839 Cherokee Constitution established boundaries as described in the 1833 treaty, and the Constitution as amended in 1866 recognized those same boundaries, "subject to such modification as may made necessary" by the 1866 treaty. 1839 Cherokee Constitution, art. 1, § 1, reprinted in Volume 1 of West's Cherokee Nation Code Annotated (1993 ed.). 
9. Cherokee Nation's most recent Constitution, a 1999 revision of its 1975 Constitution was ratified by Cherokee citizens in 2003 and provides: "The boundaries of the Cherokee Nation territory shall be those described by the patents of 1838 and 1846 diminished only by the Treaty of July 19, 1866, and the Act of Mar. 3, 1893." 1999 Cherokee Constitution, art. 2.
¶12 The District Court also noted that the State "also made clear that the State of Oklahoma takes no position as to the facts underlying the existence, now or historically, of the alleged Cherokee Reservation" and that "[n]o evidence or argument was presented by the State specifically regarding disestablishment or boundary erasure of the Cherokee Reservation."
¶13 The District Court concluded its order by stating, "no evidence was presented to this Court to establish Congress explicitly erased or disestablished the boundaries of the Cherokee Nation or that the State of Oklahoma has jurisdiction in this matter. As a result, the Court finds that B.C. was an Indian and that the crime occurred in Indian Country."
¶14 Both Petitioner and the State
[3] filed response briefs addressing issues from the evidentiary hearing. Petitioner argues that the State "presented no evidence and did not challenge any of [the District Court's] findings. This Court should adopt the uncontested findings and conclusions of the District Court, and hold the State lacks subject-matter jurisdiction over Mr. Cole's case."
¶15 In its supplemental brief, the State acknowledges the District Court accepted the parties' stipulations as set forth above based on documentation showing B.C.'s quantum of Indian blood and her posthumous enrollment as a member of the Cherokee Nation. The State also acknowledges the District Court applied McGirt and found Congress did establish a Cherokee Reservation and that "it remained intact." Ultimately, the State acknowledges the District Court's conclusion that "B.C. was an Indian and that the crime occurred in Indian Country."
¶16 The State argues this Court should find concurrent jurisdiction between it and the federal government or that Petitioner's claim is procedurally barred. This Court addressed both of those arguments recently in Bosse v. State, 2021 OK CR 3, __ P.3d __. With regard to concurrent jurisdiction, after finding no support for the argument in the law, the Court held, "[a]bsent any law, compact, or treaty allowing for jurisdiction in state, federal or tribal courts, federal and tribal governments have jurisdiction over crimes committed by or against Indians in Indian Country." Id., 2021 OK CR 3, ¶ 28, __ P.3d at __. The Court also found no merit in the State's procedural bar argument, holding, "McGirt provides a previously unavailable legal basis for [the jurisdictional] claim. Subject-matter jurisdiction may-indeed, must-be raised at any time. No procedural bar applies, and this issue is properly before us." Id., 2021 OK CR 3, ¶ 22, __ P.3d at __, citing 22 O.S.[2011], §§ 1089(D)(8)(a), 1089(D)(9)(a).
¶17 The State requests that should this Court find Petitioner is entitled to relief based on the District Court's findings, this Court should stay any order reversing the conviction for thirty (30) days so the United States Attorney's Office for the Northern District of Oklahoma can secure custody of Petitioner.
¶18 After thorough consideration of this proposition and the entire record before us, including the original post-conviction record, transcripts of the evidentiary hearing, and briefs of the parties, we find that under the law and the evidence relief is warranted. While the State stipulated to B.C.'s status as an Indian, the State took no position and presented no argument regarding the existence of the Cherokee Reservation and whether it has been disestablished. This acquiescence has created a legal void in this Court's ability to adjudicate properly the facts underlying Petitioner's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue. State v. Delso, 2013 OK CR 5, ¶ 5, 298 P.3d 1192, 1194.
¶19 Based upon the record before us, the District Court's Order is supported by the evidence presented at the evidentiary hearing. We therefore find Petitioner has met his burden of establishing B.C.'s status as an Indian, having 1/16 Cherokee blood quantum and being a posthumously enrolled member of the Cherokee Nation. We also find the District Court appropriately applied McGirt to determine that Congress did establish a Cherokee Reservation and that no evidence was presented showing that Congress explicitly erased or disestablished the boundaries of the Cherokee Nation or that the State of Oklahoma had jurisdiction in this matter.
¶20 Petitioner's victim, his infant daughter, B.C., was Indian and this despicable crime occurred in Indian Country. The State of Oklahoma did not have jurisdiction to prosecute Petitioner. Petitioner's sole proposition is granted.
DECISION
¶21 The Judgment and Sentence of the District Court of Rogers County is REVERSED and the case is REMANDED with instructions to DISMISS. The MANDATE is STAYED for twenty (20) days from the delivery and filing of this decision.
[4] 

AN APPEAL FROM THE DISTRICT COURT OF ROGERS COUNTY
THE HONORABLE KASSIE N. MCCOY, ASSOCIATE
DISTRICT JUDGE





APPEARANCES AT EVIDENTIARY HEARING

APPEARANCES ON APPEAL







MICHAEL W. LIEBERMAN
THOMAS D. HIRD
ASST. FEDERAL PUBLIC DEFENDERS
215 DEAN A. MCGEE AVE., #707
OKLAHOMA CITY, OK 73102
COUNSEL FOR PETITIONER

MICHAEL W. LIEBERMAN
THOMAS D. HIRD
ASST. FEDERAL PUBLIC DEFENDERS
215 DEAN A. MCGEE AVE., #707
OKLAHOMA CITY, OK 73102
COUNSEL FOR PETITIONER


MATTHEW J. BALLARD
DISTRICT ATTORNEY
210 W. DELAWARE, STE. 202
VINITA, OK 74301
COUNSEL FOR RESPONDENT

MIKE HUNTER
ATTORNEY GENERAL
OF OKLAHOMA
RANDALL YOUNG
ASST. ATTORNEY GENERAL
313 N.E. 21ST ST.
OKLAHOMA CITY, OK 73105
COUNSEL FOR RESPONDENT


MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA
RANDALL YOUNG
JULIE PITTMAN
ASST. ATTORNEYS GENERAL
313 N.E. 21ST ST.
OKLAHOMA CITY, OK 73015
COUNSEL FOR RESPONDENT




SARA HILL
CHRISSI NIMMO
CHEROKEE NATION, OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 1533
TAHLEQUAH, OK 74465
COUNSEL FOR THE CHEROKEE NATION



OPINION BY: LUMPKIN, J. KUEHN, P.J..: Concur in Results ROWLAND, V.P.J.: Specially Concur
LEWIS, J.: Concur in Results
HUDSON, J.: Specially Concur
FOOTNOTES
[1] As stated in my separate writing in Bosse v. State, 2021 OK CR 3, __P.3d __, (Lumpkin, J., concurring in result), I am bound by my oath and adherence to the Federal-State relationship under the U.S. Constitution to apply the edict of the majority opinion in McGirt v. Oklahoma, 591 U.S. __, 140 S. Ct. 2452 (2020). However, I continue to share the position of Chief Justice Roberts' dissent in McGirt, that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed.
[2] The record reflects that B.C.'s application for enrollment in the Cherokee Nation was pending at the time Petitioner murdered her on December 20, 2002 and was approved on June 23, 2003.
[3] We deny Petitioner's Motion to Strike Supplemental Brief of Respondent after Remand and grant Respondent's Motion to Substitute Supplemental Brief. The Clerk is directed to file Respondent's tendered Substitute Supplemental Brief.
[4] By withholding the issuance of the mandate for 20 days, the State's request for time to determine further prosecution is rendered moot.




KUEHN, PRESIDING JUDGE, CONCURRING IN RESULT:
¶1 I agree with the Majority that the State of Oklahoma had no jurisdiction to try Petitioner, and his case must be dismissed. This Court recently found that the Cherokee Reservation was not disestablished, and is Indian Country. Spears v. State, 2021 OK CR 7, ¶¶ 15-16. Oklahoma does not have jurisdiction to prosecute crimes committed by or against Indians in Indian Country. Bosse v. State, 2021 OK CR 3, ¶ 28; 18 U.S.C. §§ 1152, 1153. Because the issue of reservation status has already been decided, I find the Majority's lengthy discussion of it superfluous dicta. I recognize with regret the painful effect of this decision on the victim's family. I note that the Majority's inclusion of a blood quantum is inappropriate and unnecessary. This Court, like the Tenth Circuit, requires only a finding of some Indian blood to determine Indian status, and has explicitly rejected a specific blood quantum requirement. Bosse, 2021 OK CR 3, ¶ 19.
¶2 At the evidentiary hearing, the State took no position on reservation status. I cannot agree with the Majority's characterization of this as "acquiescence." In the Order remanding the case for an evidentiary hearing, this Court left open the possibility that the parties would enter into stipulations of fact or law. The parties did so here. In addition to those stipulations, the State chose to take no position on the establishment or disestablishment of the reservation at issue. I believe that decision reflected an available legal strategy, given the clear ruling in McGirt and the treaty law surrounding the Cherokee Reservation.[1] While this Court might prefer that the State acknowledge the McGirt ruling and its clear implications, the State's adoption of this wait-and-see strategy is not legally unsound.
¶3 Nor do I agree that the State's position created a "legal void". In any adversarial proceeding, a party may choose to present evidence and give argument. Petitioner provided the trial court with maps, treaties, and statutes relevant to the jurisdictional issue. The State chose not to augment or contest this law and evidence. That was a responsible choice, and one entirely consistent with effective representation. There was a full record below and a full record on appeal. The trial court's findings and conclusions clearly set forth the details of the evidence it used to make its decisions. The Majority may wish that more, or different, evidence had been presented. That does not leave a void in the record.
FOOTNOTES
[1] This position is also entirely consistent with the State's position in civil Indian Child Welfare Act proceedings. On September 1, 2020, the Oklahoma Department of Human Services, on behalf of the State, entered into an Intergovernmental Agreement Between the State of Oklahoma and the Cherokee Nation Regarding Jurisdiction Over Indian Children Within the Nation's Reservation (filed, Oklahoma Secretary of State, Sept. 1, 2020). Throughout the Agreement the State explicitly recognizes the continued existence of the Cherokee Reservation.




LEWIS, JUDGE, CONCURRING IN RESULTS:
¶1 Pursuant to my special writings in Bosse v. State, 2021 OK CR 3, ___ P.3d ___ and Hogner v. State, 2021 OK CR 4, ___ P.3d ___, I concur in results. Following the precedent of McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), Oklahoma has no jurisdiction over persons who commit crimes against Indians in Indian Country. This crime occurred within the historical boundaries of the Cherokee Nation Reservation and that Reservation has not been expressly disestablished by the United States Congress. Additionally, the crime occurred against an Indian victim, thus the jurisdiction is governed by the Major Crimes Act found in the United States Code.
¶2 Oklahoma, therefore, has no jurisdiction, concurrent or otherwise, over the petitioner in this case. Thus, I concur that this case must be reversed and remanded with instructions to dismiss. Jurisdiction is in the hands of the United States Government. 




HUDSON, J., SPECIALLY CONCURRING:
¶1 Today's decision applies McGirt v. Oklahoma, 140 U.S. 2452 (2020) to the facts of this case and dismisses a first degree murder conviction that resulted in a death sentence from the District Court of Rogers County. I fully concur in the majority's opinion based on the stipulations below concerning the Indian status of the victim and the location of this crime within the historic boundaries of the Cherokee Reservation. Under McGirt, the State has no jurisdiction to prosecute Petitioner. Instead, Petitioner must be prosecuted in federal court. I therefore as a matter of stare decisis fully concur in today's decision. 
¶2 I also join Judge Rowland's observation in his special writing that the Major Crimes Act does not affect the State of Oklahoma's subject matter jurisdiction in criminal cases but, rather, involves the exercise of federal criminal jurisdiction to effectively preempt the exercise of similar state authority. Further, I maintain my previously expressed views on the significance of McGirt, its far-reaching impact on the criminal justice system in Oklahoma and the need for a practical solution by Congress. See Bosse, 2021 OK CR 3, __P.3d__ (Hudson, J., Concur in Results); Hogner v. State, 2021 OK CR 4, __P.3d__ (Hudson, J., Specially Concurs); and Krafft v. State, No. F-2018-340 (Okl.Cr., Feb. 25, 2021) (Hudson, J., Specially Concurs) (unpublished).
 





 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2007 OK CR 27, 164 P.3d 1089, COLE v. STATE
Discussed
 2013 OK CR 5, 298 P.3d 1192, STATE v. DELSO
Discussed
 2021 OK CR 3, BOSSE v. STATE
Discussed at Length
 2021 OK CR 4, HOGNER v. STATE
Discussed
 2021 OK CR 7, SPEARS v. STATE
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1089, Post-Conviction Relief for Death Penalty Conviction - Grounds for Appeal
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA