2009 OK CR 3

### Katherine RUTAN a/k/a Katherine Pollard, Appellant

v.

### STATE of Oklahoma, Appellee.

### No. F–2007–1022.

Court of Criminal Appeals of Oklahoma.

Feb. 13, 2009.

---

**40.** *Id.*

Larry T. Jordan, Gerald Weis, Clinton, OK, counsel for appellant at trial.

Ray Don Jackson, District Attorney, Chris L. Ross, A.J. Laubhan, Assistant District Attorneys, Woodward, OK, counsel for the State at trial.

Michael D. Morehead, Oklahoma Indigent Defense, Norman, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Keeley L. Harris, Assistant Attorney General, Oklahoma City, OK, counsel for The State on appeal.

## OPINION

LUMPKIN, Judge.

¶ 1 Appellant Katherine Rutan Pollard was tried by jury and convicted of First Degree Murder (21 O.S.2001, § 701.7), Case No. CF–2006–31, in the District Court of Woods County.[1] The jury recommended as punishment life imprisonment without the possibility of parole and the trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals.

¶ 2 Appellant and her two young sons, 6 year old Logan Tucker and 4 year old J.D., shared a home with Melody Lennington in Woodward, Oklahoma. At approximately 3:00 a.m., Sunday, June 23, 2002, Ms. Lennington was awakened by a scream. She recognized the voice as that of Logan. Thinking he was having another nightmare, she want back to sleep. A short time later, she got out of bed to find Appellant in the front room at the computer. Lennington asked if Logan was okay. Appellant said he was sick so she had put him in a back bedroom. Lennington returned to bed and woke up again at 6:00 a.m. to get ready for work. Appellant was still sitting at the computer. Lennington again asked if Logan was okay. She told Appellant she needed to get her work clothes from the back bedroom and didn't want to disturb Logan. Appellant told her, "[d]on't worry about it. He's in the basement." The basement was solid cement with cinder blocks and contained the hot water heater, an old cabinet, and an old soiled twin mattress on a set of springs. No place for a sick child, thought Lennington. Although upset that Logan was in the basement, Lennington got ready and left for work.

1. The felony information against Appellant was filed in Woodward County. Due to extensive pre-trial publicity, a change of venue was granted and the trial was moved to Woods County.

¶ 3 The scream was the last anyone heard from Logan Tucker. Appellant had long seen Logan as an obstacle that stood between her and the life she wanted to live. Paul Mullins, a former boyfriend who lived with Appellant in 1999, frequently observed Appellant hit Logan with enough force to knock him to the ground. Appellant told Mullins she felt trapped and asked him several times when she would be able to start enjoying her life. Arriving home from work one night, he observed that Logan "had been beaten and beaten severely."

¶ 4 Brady Gougler, Appellant's third husband to whom she was married from 1999 to 2001, observed Appellant yell at the children frequently and spend time at the computer instead of with them. In August 2001, Appellant told her neighbors in Nowata, Oklahoma, the Randells, that she could not stand Logan and that she felt he was a mistake that stood in the way of what she could accomplish, that he was the reason her relationships failed and she did not know what she might do to him. The Randells noticed that Appellant's relationship with Logan was different from that with J.D. While J.D. received her attention and compassion, Logan was pushed aside and ignored. The Randell's fifteen year old daughter, Ashlee, observed Appellant discipline the boys and felt her discipline of Logan was excessive. She said Appellant repeatedly spanked Logan with a belt and plastic coat hangers.

¶ 5 Having separated from Gougler, Appellant moved in with Richard Cody later that year. They had met at their children's day care center. One evening, Appellant and her sons, and Cody and his daughter went for a drive. Appellant and Logan screamed at each other most of the ride. At one point, Appellant told Cody to stop the truck. She took Logan out of the truck, left him on the side of the road, and told Cody to drive off and leave him there. Cody drove a few feet before stopping and putting Logan back in the truck.

¶ 6 During the relationship, Appellant told Cody that her brother had offered her a job out of state, but that she would not be able to bring her children because her brother did not like children. One night Cody and Appellant were in bed talking. Appellant told Cody she wished there was some way she could kill her kids and get away with it. Not believing what he heard, Cody replied, "excuse me." Appellant repeated what she had said, but then said she was only kidding. Cody was so disturbed by what he heard that he left his bed and slept the night in his daughter's bed. With the help of a crisis center, Cody got Appellant out of his house within three to four days.

¶ 7 Kevin Caudill met Appellant in March 2002 and though they dated only a couple of months, they remained friends. One night, Appellant phoned Caudill, upset. She said that most people look forward to the weekend to spend time with their children, but her children were the very reason she dreaded the weekend.

¶ 8 On April 27, 2002, Tulsa police officers responded to a call to check the well-being of a child. Appellant told the officers she was afraid she was going to hurt her children, did not want to be around them, and that Logan "made her so angry that she just wanted to hit him as hard as she could." The officers took both boys into protective custody and transported them to a shelter.

¶ 9 Michelle Christy interviewed Appellant regarding the April 27 incident for the Department of Human Services (DHS). Appellant told her she felt "very overwhelmed" by Logan and she was often angry at him and yelled at him frequently. Appellant wanted her parents, the Cathcarts, to take Logan. However, despite helping Appellant with the children in the past, Mr. and Mrs. Cathcart, who lived in Florida, were unable to take Logan at that time.

¶ 10 After a hearing, the children were returned to Appellant on May 2, 2002. About this time Appellant met Michael Pettey through personal ads she had posted on the internet. On the day her children were returned to her, she told Pettey in an e-mail that Logan would not be coming home.

¶ 11 By the middle of May, Appellant and Pettey were discussing the idea of Appellant moving from her home in Tulsa to Fort Supply, where Pettey lived. While Pettey wanted Appellant to move to the area, he

expressed reservations about actually living with her. Appellant had other ideas. On May 23, she informed Pettey that she had been fired from her job and she and the boys were moving to Fort Supply. Appellant and the children lived with Pettey for two weeks. Not ready for that type of relationship, Pettey looked for another place for Appellant to live.

¶ 12 Pettey made arrangements for Appellant and her children to move in with his co-worker, Melody Lennington. Appellant and her children moved into Lennington's home on June 10, 2002. Appellant spoke poorly of Logan in Lennington's presence as well as Logan's. She blamed him for trying to burn down their home in Tulsa. On June 19, 2002, Lennington smelled sulphur in her house and found Logan with cigarettes and J.D. with a lighter. Lennington called the police. When they arrived, Appellant told them Logan was trying to burn down Lennington's house and she wanted him arrested. The officer did not take Logan into custody, but called Jimmie Fraley, a mental health worker, to the scene.

¶ 13 Appellant later told Pettey she found Logan with matches trying to burn down Lennington's house. Feeling responsible for Appellant living with Lennington, and having previously been told by Appellant that Logan had tried to burn down their Tulsa home, Pettey told her he wanted her out of Lennington's home. He told her he did not want her at his house, his mother's house, or at the house of anyone else he knew, because he did not want Logan to burn anything down.

¶ 14 On that day and the next, June 20, 2002, Appellant spoke to three different people, Aubrey Mabrey of the Northwest Domestic Crisis Services, Jimmie Fraley of the Mental Health Center in Woodward, and RaGenia Ives of DHS, in an attempt to send Logan away immediately, either by sending him to a hospital, to a shelter, or relinquishing her parental rights. Appellant told Aubrey Mabrey that Logan hid some lighters from her and that he stabbed J.D. She said that Logan finally showed her where the lighters were, but the lady she was living with told her she had to find another place to live. Appellant also told Mabrey she had called DHS and spoken with RaGenia Ives who told her DHS had closed her case and they could not help her. Appellant further said that both she and her boyfriend were scared of Logan and that the youth shelter would not take him.

¶ 15 Appellant told Jimmie Fraley she wanted Logan placed in inpatient psychiatric care at a hospital. Fraley called Meadowlake Hospital, a psychiatric hospital for children, and was told there was no room available immediately, but if they could wait a few days, there would be space by Monday, June 24. Fraley went ahead and made an appointment for Logan for Monday morning. Appellant was extremely upset when she learned Logan could not be admitted that day. She told Fraley he was dangerous and needed to be placed immediately. During the interview, Fraley observed Logan to be a "normal little boy," well-mannered and friendly. However, Appellant appeared to be angry with Logan, impatient and very strict with him. When Appellant left Fraley's office, she shouted, "[y]ou people never listen to me. He's a child murderer and a house burner, and you won't do anything."

¶ 16 RaGenia Ives visited Appellant at Lennington's home. Appellant spent most of the time telling Ives about Logan's bad behavior. She said Logan was affecting her relationship with her boyfriend and she was afraid he would leave her because of Logan. Appellant told Ives they were waiting for space to open up at Meadowlake Hospital. Ives observed Logan to be healthy, clean and appropriately dressed. When Ives first arrived, Logan asked her if she was there to take him away.

¶ 17 Around this time, Appellant became fixated on an accident that had occurred Memorial Day Weekend in which a bridge on I–40 had collapsed over a river. Appellant repeatedly talked to Debra Lenning, Pettey's sister, about the fact that people drove off the bridge and were never seen again, that they "just disappear[ed] into thin air." On Friday, June 21, 2002, Appellant was upset that she could not attend a motorcycle rally that weekend with Pettey. She told Lennington she could not find anyone to stay with her children, particularly Logan.

¶ 18 On June 23, and the days thereafter, Appellant told several different stories to explain Logan's absence. Around noon on the 23rd, Lacie Lennington arrived to visit her mother. When asked where the boys were, Appellant, who was playing cards on the computer, replied that DHS had just picked up Logan. Having previously been told by Appellant that if DHS took one boy they would take the other, Lacie asked if both boys had been taken. Appellant replied that only Logan had been taken. Appellant did not seem to be upset over the matter.

¶ 19 That afternoon, Appellant met Pettey at the home of Dee Kirby. Appellant told them she was upset because DHS had picked up Logan. Appellant said she was treating the situation the same as when her infant daughter, Logan's twin, passed away at birth.[2] She said she was going to look at it as if Logan was dead because that was the way she could cope with it. She added that Logan wasn't dead, but she was going to treat it like he was. Appellant also talked to Jim Stinnett and Evelyn Pettey that day. She told Stinnett, her next door neighbor, that DHS had taken Logan earlier that day. She told Ms. Pettey, Michael Pettey's mother, that DHS had taken Logan and she would not see him again until he was 18 years old. Ms. Pettey thought it was odd that DHS would pick up a child on a Sunday morning. Based upon a comment from J.D., Ms. Pettey observed a "goopy-looking" substance on the front of Appellant's shirt. Appellant explained she had spilled a candle on herself. Ms. Pettey also noticed that Appellant kept scratching her arms and legs. Appellant explained that she and J.D. had been out walking in the brush and it made her itch.

¶ 20 At approximately 4:00 p.m. that day, Lennington's other daughter, Christy Vaughn, went to check on her mother. When she arrived at the house, she found no sign of Logan. Finding Appellant in the kitchen, Vaughn began a conversation. Appellant started to cry and told Vaughn that DHS had taken Logan. Appellant said it "felt like a stress was lifted off" of her, that "the weight was lifted off." Appellant then tried to give Vaughn some of Logan's clothes. When asked where she thought Logan would end up, Appellant said she thought the "real father" would have him. At the time, Ms. Vaughn worked for the Woodward County Police Department as a police dispatcher. In that capacity, she had not received any information that DHS was to pick up Logan.

¶ 21 Later that day, Ms. Lennington returned home to find Appellant next door at Pam Chambers' home. Appellant told the women that DHS had picked up Logan and showed them a bruise on her arm claiming it had been caused by Logan. Appellant explained that DHS was going to give Logan to his natural father. Appellant tried to give Chambers Logan's clothes and toys for her grandchildren explaining that DHS would not let him have those things. Chambers refused to accept the items.

¶ 22 That evening, Michael Pettey arrived at Appellant's house per her request to talk. He found her dressed up as if ready for a date. He said she did not seem sad and did not mention Logan. The couple went to Phillip Burkhalter's home to look at pictures from a motorcycle rally. During the evening, Appellant told Burkhalter that DHS had taken Logan that morning.

¶ 23 On Monday, June 24, Dannella Smith, with Meadowlake Hospital, phoned Appellant to tell her that a bed was available for Logan. Appellant told her she didn't need the space, that Logan was going to live with his uncle.

¶ 24 That same day, Appellant told Melody Lennington that she had seen some wildflowers that she thought would look pretty in Lennington's window box. Appellant told Lennington she was going to dig up the flowers and bring them back to the house and plant them. Later that day, Appellant borrowed a shovel from Pettey and some clear Visqueen plastic he was using to build a pond in his yard. Appellant never brought Lennington any wildflowers.

2. Appellant's father testified that he was present at Logan's birth and that Logan was a single birth, there was no twin.

¶ 25 On June 25, Appellant spoke to Jennifer Winn with DHS about raising her food stamps. The day-care services for Logan and J.D. were also cancelled as Appellant was not working. Appellant explained that she was having problems with Logan and was trying to put him in some type of facility. She said he was currently in another town with his grandparents. Also on that day, Appellant phoned her parents to tell them that DHS had taken Logan and her parental rights were going to be terminated. She told them Logan had been placed in a facility for disturbed children and he was not to be contacted.

¶ 26 On June 26, RaGenia Ives received a message from Meadowlake Hospital that the appointment for Logan Tucker had been cancelled. Ives called Appellant and asked what had happened. Appellant told her she had cancelled the appointment at Meadowlake because she had sent Logan to her brother in Vermont to go camping, and that afterwards she was going to place him at Brown's School in Tulsa.[3] Ms. Ives subsequently learned that no arrangements had been made for Logan to attend Brown's School.

¶ 27 On June 26, Appellant enrolled J.D. in a child care center in Woodward. She told the director she had an older son who had been taken away the day before to a mental hospital and would not be returning. Appellant filled out the paperwork to enroll J.D., but never took him to the center.

¶ 28 The weekend of June 27, Appellant accompanied Pettey to a motorcycle rally. There she participated in a topless contest. Phillip Burkhalter, who was also at the rally, was told by Appellant that she had learned that Logan had been placed with his natural father. When asked if that was a good situation, Appellant replied that she didn't know, she had not seen Logan's father in several years. Sometime in late June, Appellant told Dee Kirby that Logan's natural father had him. By June 29, the Cathcarts had decided they could keep Logan and called DHS to check on him. They found he was not in DHS custody.

¶ 29 By late June and early July, 2002, Appellant's conflicting stories began to attract the attention of law enforcement. The media began running stories concerning Logan's disappearance. During this time, Appellant sought out people to make calls to appease the authorities and her parents, who she then knew were looking for Logan. Between July 5 and 7 she asked three different women to call her parents and tell them Logan was alright. On July 5, she asked Dee Kirby to phone her parents and let them know that Logan was okay. Having no idea where Logan was, Kirby refused. On July 6, Appellant told Kathy Link, whom she had met through Dee Kirby, that she was looking for someone to call her parents and let them know that Logan was okay. Appellant explained to Link that Logan was with his biological father who had gone to court and gotten custody of him, and she did not want him taken from where he was. Link told Appellant it would be hard to find someone to make such a call without knowing the situation. On July 7, Appellant asked Fancie Hamilton, whom she had met through Pettey, to call her parents and tell them Logan was okay. Appellant told Hamilton that if her parents started asking questions to hang up. Not knowing where Logan was, Hamilton asked Appellant why she wanted to make the call. Appellant replied, "because everybody's wanting to know where [Logan's] at, and he's with his father in South Carolina." Appellant also told Hamilton to tell her parents that "any outside contact would not be advised" and "not to worry about him, he'd be fine." Hamilton did not make the phone call.

¶ 30 On July 7, Appellant also called Kevin Caudill, who she had not seen in a long time. She told him that her brother had taken Logan on a camping trip to either Pennsylvania or Vermont. When Caudill said that covered a big area and asked which state it was, Appellant couldn't remember. She then said that the Woodward County Sheriff's Department was looking for her son. She asked Caudill to call them, pretend to be her

3. By the time of trial, Brown's School was known as Shadow Mountain Behavioral Health Center.

brother and say that Logan was with him camping. Caudill refused, telling Appellant to "give it a couple of days" to see if her brother called. On July 8, Appellant called Caudill on his cell phone and his home phone. Seeing her number on the phones, he didn't answer the call. Appellant left a message for Caudill to "call me" but Caudill did not return the call.

¶ 31 On July 7, Mickey Cathcart, Appellant's brother, called the Woodward authorities and asked them to check on the welfare of Logan and J.D. That same day, officers from the Woodward County Sheriff's Department arrived at Lennington's home. Observing them pull into the driveway, Lennington told Appellant of their arrival. Appellant got up from her chair, told Lennington to tell them she was not there and went to her bedroom. The officers informed Lennington they were there to speak to Appellant. Lennington told them she was there and called Appellant to talk with the officers. They told her they were there to do a welfare check on Logan. Appellant told the officers that Logan was with her brother, Brian Marquardt, on a camping trip in either Pennsylvania or Vermont. The officers asked for Marquardt's phone number, but Appellant did not have one. After the officers left, Lennington confronted Appellant about what she had told the officers. Appellant admitted she had lied to the officers but said nothing more.

¶ 32 On July 8, Appellant approached Don Hackley at a local gas station. Appellant and Hackely had never met. Appellant, talking in a whisper, asked him to leave a message on an answering machine that Logan was okay. Appellant dialed the number and Hackely left the following message, "[t]his is for Katie. And this is for her brother. She (sic) has Logan. He's all right, and they'll be back in a couple of weeks." A few days later, Hackley heard on the radio that a little boy named Logan was missing. Remembering Appellant and the phone call, he contacted law enforcement.

¶ 33 The evening of July 8, Appellant phoned the sheriff's office to report she had received a message from her brother Brian on her answering machine. When the authorities arrived, Appellant played the message left by Hackley, but claimed the voice was that of her brother Brian. When asked how the authorities could contact Brian, Appellant said she did not have a phone number. However, the authorities already had a phone number for Brian and called it in Appellant's presence. They asked Brian Marquardt if he had Logan. He said he did not. Appellant claimed she told her brother not to tell anyone where Logan was. When Undersheriff Clem called Marquardt back he handed the phone to Appellant. Marquardt could be heard yelling at Appellant over the phone. When the undersheriff tried to take the phone from Appellant, she pulled it away. Undersheriff Clem asked Appellant to accompany him to the sheriff's office and Appellant agreed. During the ensuing interview, Clem told Appellant that by the next morning she needed to call her brother and get Logan back or file a kidnapping report. If she did not, the situation would be treated as a homicide. Appellant never filed a kidnapping report.

¶ 34 That same evening, Sergeant Barnett and Sheriff Morton returned to Lennington's home and searched everything except Appellant's bedroom. In the basement, they found an old bed without bedding, a pillow with no covering, wood shelves, and a white bucket on the floor. On the pillow, mattress, and floor directly beneath the bed was a substance which appeared to be orange candle wax. In the bucket was a wad of masking tape which contained clumps of whitish blond hair and a small blood stain, and more of the orange waxy substance. Subsequent DNA testing revealed that the hair and blood came from a male biological child of Appellant and Robert Tucker, Logan's biological father.

¶ 35 Appellant's car was also searched. Inside the trunk was found drain cleaner, rope, and an amount of plastic that was so large it could barely fit into a three foot envelope. The heavy Visqueen plastic was the same type that Michael Pettey had on his property.

¶ 36 The Woodward County authorities registered Logan's disappearance with two national organizations, The National Center for Missing and Exploited Children and the

Vanished Children Lights. Extensive searches, involving 300 to 400 volunteers and spanning numerous days were made in the areas surrounding Woodward and Fort Supply. Appellant never participated in any of the searches nor called the sheriff's office to check on the status of the searches.

¶ 37 On July 9, 2002, officers again searched Lennington's home, with her consent. As a result of this search, Lennington realized she was missing a blue suitcase that had belonged to her father. The last time she had seen the suitcase, it was in a closet in the back bedroom. Officers told Lennington what they believed happened to Logan. After the police left, Appellant pulled into the driveway and said to Lennington, "I suppose you want me to leave." Lennington said, "yes." Appellant gathered her things from the house and left. Sometime in July, Appellant had a conversation with Jamie Adams at a McDonald's restaurant. She told the young woman that she had one son who was four years old.

¶ 38 Further investigation revealed that Brian Marquardt never took Logan camping and had never had him in his custody. Marquardt, his sales company W.O.W. Industries, its employees and business travels were thoroughly investigated by state and federal authorities. It was established that on June 23, 2002, Marquardt and his employees were in Maryland and subsequently traveled to West Virginia. The evidence showed there was never a small child traveling with the company. FBI agents interviewed Robert Tucker, Logan's biological father, on July 12. Tucker said he had not seen Logan since he was an infant. Ronald Tucker, Robert's brother, was also interviewed. In 2002 he and his brother lived close to each other in North Carolina. By the time of trial, they lived together in South Carolina. He said that he had never seen Logan in his brother's custody.

¶ 39 In July 2002, authorities placed undercover officer Rick Stephens in an apartment across the hall from Appellant's apartment in Woodward. Over the next month, Appellant told Stephens that Logan was camping with her brother in Wisconsin. She later told him she believed in her heart he was dead. She said that her ex-boyfriend and the ex-boyfriend's roommate had taken Logan. She admitted that she had made several phone calls to friends in areas outside of Woodward to please the police and say that they'd seen Logan. She told Stephens that "if law enforcement found out she had done it, she'd hung herself." Appellant also told Stephens that she felt like her attorney did not trust her, was secretly recording her, and believed she knew more about her son's disappearance than she was telling.

¶ 40 On August 9, 2002, Appellant was interviewed by FBI Agent Ronald Parrish. Appellant said that her brother Brian had agreed to take Logan and arrived at Melody Lennington's home on June 23 at approximately 11:00 a.m. or noon to pick him up. She said that three or four days later, her brother left a message on Lennington's phone telling her that Logan was all right and they were going camping the next day. She said before she could get Brian's phone number, he hung up.

¶ 41 On September 7, 2002, Appellant moved to Bartlesville, Oklahoma. Subsequently, Appellant and her husband visited in the Salzyn home as Mr. Salzyn and Appellant's husband worked together.[4] When the Salzyn's young son began fussing, Appellant commented to Laura Salzyn that "she remember[ed] those days." Not realizing that Appellant had any children, Mrs. Salzyn asked Appellant about her children. Appellant replied that she had a son that would have been nine and a son that was six. When asked what happened to the older son, Appellant replied that he had been, "killed by a drunk driver." Appellant explained that afterwards she was "a real mess" and she decided she should give up her parental rights to her other son and have him live with his father.

¶ 42 Appellant's younger son, J.D., was 9 years old at the time of trial. He testified that the last time he saw Logan, it was the afternoon and they were in the backseat of Appellant's car together. Logan was not talking or moving. J.D. said Appellant

---

4. The record does not indicate when Appellant married Mr. Pollard.

parked on a curve and carried Logan to a house. J.D. could not see if Appellant went into the house because of the trees. When Appellant returned to the car, Logan was not with her. As they drove off, J.D. saw a man looking through the window of the house. J.D. never saw Logan again.

¶ 43 Several interviews with J.D. were conducted by investigators and recorded in July and August, 2002. During an interview on July 9, J.D. told investigators that Logan was with "my mom's brother." J.D. said he didn't know his uncle's name and he had not seen him. He said Logan was not coming back because he was bad. He told the investigators that Logan was sick when he went with his uncle, and that his uncle had picked Logan up from the doctor and taken him far away. He said that when Logan left he forgot to take his clothes and toys with him.

¶ 44 During an interview on July 15, J.D. told investigators that Appellant borrowed a shovel from Michael Pettey's house and they went digging for flowers. J.D. said Logan was with their uncle at the time. J.D. said when Appellant put the shovel in the trunk, she also put in plastic. When J.D. was asked what Appellant was doing when she went to dig, J.D. did not want to say because it kept "hurting [his] heart." J.D. led investigators to a spot where he told them, "Mama put her foot on the fence and got the shovel and went through the fence that way into the grassy area." As he said this, J.D. became despondent and wanted to leave the area. Authorities returned to the second area J.D. had led them and found a dig mark which appeared to have been made with a shovel in the ground which was very hard.

¶ 45 During an interview in August 2002, J.D. was asked why Appellant needed the shovel and the plastic. He said it was, "[t]o bury Logan." When asked what that meant, J.D. said it was to put dirt on Logan. However, he said he didn't see Appellant put any dirt on Logan. J.D. said that to keep Logan from crying, Appellant put tape over his eyes and mouth. However, before she put the tape over his mouth, she put food in it.

¶ 46 In another interview in August 2002, investigators took J.D. back to Lennington's home where he became "very agitated" when talking about Logan being in the back room. J.D. said that in the morning Appellant dressed Logan in the living room in the blue chair. He said Logan was sick and was not crying or talking. J.D. pointed out a desk in the living room where he said Appellant had gotten the tape. J.D. opened the desk and commented, "the tape's not here anymore." J.D. said Appellant carried Logan from the house to the car. He said Logan sat in the backseat with his head slumped over, that Logan was sick, he was not moving or crying and he was very white. When asked to explain about Logan being sick, J.D. indicated he didn't want to talk about it. When asked why, he said, "it hurts" and began crying. J.D. said that after Appellant drove around with him and Logan in the car, she found an old run down farm house where she stopped and left Logan.

¶ 47 Appellant was arrested and charged with Logan's murder in 2006. At that time, Mark Bell, a sanitation worker in Woodward, remembered something which occurred around the time of Logan's disappearance. Bell remembered that during his trash route on a Tuesday, he came across a suitcase located across the street from Ms. Lennington's residence. It was not in a place where Ms. Lennington usually placed her trash. The blue suitcase was bulky, wrapped in a clear, thick plastic, and tied with a rope. Bell thought the suitcase weighed anywhere from 40 to 60 pounds and that it smelled like a dead animal. Bell wanted to look inside the suitcase, but it would have taken a while to unwrap and untie it, and he needed the aid of a knife. Further, he noticed that he was being watched by a woman from across the street.

¶ 48 Based upon Bell's information, and Ms. Lennington's missing blue suitcase, the area landfill was searched. The landfill was used by several surrounding counties and by the time it was searched it contained 4 years worth of trash. Despite searching every day, all day, from March through July 2006, using a trackhoe type system and a core drilling machine, Logan's body was never found. Further facts will be set forth as necessary.

¶ 49 In her first assignment of error, Appellant challenges the sufficiency of the evidence supporting her conviction. Specifically, she argues the State failed to produce sufficient evidence to prove she used unreasonable force which resulted in the death of Logan Tucker. When reviewing challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Easlick v. State,* 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559; *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204. The credibility of witnesses and the weight and consideration to be given to their testimony are within the exclusive province of the trier of facts. *Bland v. State,* 2000 OK CR 11, ¶ 29, 4 P.3d 702, 714. Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal. *Id.* On appellate review this Court accepts all reasonable inferences which tend to support the jury's verdict. *Scott v. State,* 1991 OK CR 31, ¶ 4, 808 P.2d 73, 76.

¶ 50 Appellant was charged under 21 O.S. 2001, § 701.7(C) with committing the crime of first degree murder of a child by "unlawfully, willfully, and maliciously us[ing] unreasonable force on one Logan L. Tucker, a child under the age of 18 years ..." (O.R.1). The jury was instructed that it had to find the following elements beyond a reasonable doubt:

First, the death of a child under the age of eighteen;
Second, the death resulted from the willful or malicious using of unreasonable force;
Third, by the defendant.

(O.R.1280) OUJI–CR 2d 4–65(A).

¶ 51 The term "unreasonable force" was further defined for the jury as "[m]ore than that ordinarily used as a means of discipline." (O.R.1281). *See* OUJI–CR 2d 4–40(D). *See also Cole v. State,* 2007 OK CR 27, ¶ 25, 164 P.3d 1089, 1096 (in proving that the defendant willfully or maliciously used unreasonable force, "the State had to prove Appellant intended to use more force than was reasonable under the circumstances or, alternatively, that the amount of force was malicious insofar as showing a wish to injure").

¶ 52 The evidence immediately surrounding the commission of the crime is sufficient to show that Appellant used unreasonable force which resulted in the death of the victim. At 3:00 a.m. Logan screamed loud enough to wake up Melody Lennington. Logan was never seen or heard from again. Appellant told Lennington she put her "sick" child in the barren basement. In addition to falsely telling those around her that DHS had come and picked up Logan, she felt the need to explain a bruise on her arm, which she attributed to Logan. The wad of tape found in the basement contained mainly scalp hair from the victim, but one to two hairs appeared to be from an eyebrow. Appellant explained that the wad of tape was left from a time when Logan, J.D., and other children were putting tape all over themselves during a tornado warning. However, testimony from witnesses present in the basement at that time directly refuted Appellant's claim that the children played in the basement and that there was tape in the basement. Lennington testified she kept neither tape nor candles in the basement. Appellant admitted she had spilled candle wax on her shirt

¶ 53 Appellant contends that J.D.'s statements concerning Appellant putting food in Logan's mouth and tape over his eyes and mouth do not support a finding that Logan was fatally taped in the basement. Appellant asserts the only logical inference is that Logan was already dead or extremely ill when J.D. purportedly observed Appellant put the tape on him.

¶ 54 From the record before us, we do not know exactly what happened to Logan Tucker early that Sunday morning. We do not know whether he was alive at the time he was taken to the basement and died thereafter or whether he was already dead when he was placed in the basement. However, we do know that Appellant was his primary caregiver and the last adult to ever see him alive. We do know that at some point in time she put tape over his mouth and eyes and thereafter he neither moved nor made

any sounds. We do know that she drove the lifeless little boy around in an apparent attempt to dispose of him. Based upon this evidence, the jury could logically infer that Appellant maliciously used force on Logan beyond that ordinarily used as a means of discipline and that such unreasonable force caused his death.

¶ 55 Additionally, evidence of the history of verbal and physical abuse inflicted upon the victim by Appellant supports a finding that she used unreasonable force on Logan which resulted in his death. *See Rawlings v. State,* 1987 OK CR 135, 740 P.2d 153 (a first degree murder case where the victim's body was never found and this Court determined the defendant's history of threats and physical abuse inflicted on the victim supported the finding that the victim died as a result of the criminal acts of the defendant). When considered in its entirety, the evidence shows that Appellant did everything she could to rid herself of the burden of raising Logan, who she considered a mistake and an obstacle to having the life she felt she deserved. When she was unable to have him arrested, taken into state custody, placed in a mental hospital or given to her parents, she resorted to her expressed wish to kill her child and get away with it.

¶ 56 Appellant claims that unlike in other murder prosecutions, in child abuse murder cases, the State must prove the cause of the victim's death. In support, Appellant directs our attention to language in the statute which requires "that the harm to the child, either injury or the use of unreasonable force, be the cause of death." *See* 21 O.S. 2001, § 701.7(C). Appellant asserts that "the mere fact that an unreasonable force preceded a death of a child is not sufficient for a conviction." Appellant argues that under this statutory language, "proof of some specific act is required because, much like a typical felony-murder charge, the act replaces the *mens rea.*" In support, Appellant relies on *Gilson v. State,* 2000 OK CR 14, 8 P.3d 883, which she asserts "analogiz[ed] child abuse murder … to felony murder."

¶ 57 Appellant's reliance on *Gilson* is misplaced. In *Gilson,* we compared § 701.7(C) child abuse murder to § 701.7(B)

felony murder, only in so far as both provisions set out alternate ways of committing the crime. Under Oklahoma law, all manner of first degree murder requires that the defendant's actions cause the victim's death for a finding of guilt. *See* 21 O.S.2001, §§ 701.7(A)-(E). To accept Appellant's argument that a specific cause of death must be proven in this case would allow Appellant to literally get away with murder because she successfully disposed of the body. Contrary to Appellant's argument, "a body need not be found in order for the crime of murder to be proven." *Arnold v. State,* 1990 OK CR 78, ¶ 13, 803 P.2d 1145, 1148. In the present case, the State was required to prove that Appellant caused the victim's death by the unlawful, willful, and malicious use of unreasonable force. *See Revilla v. State,* 1994 OK CR 24, ¶ 11, 877 P.2d 1143, 1148 ("the State was not required to prove the element of intent to kill, but was required to prove that Appellant 'willfully' or 'maliciously' injured, tortured, maimed or used unreasonable force upon the victim"). Based upon the evidence in this case, there can be no other conclusion than that Appellant used unreasonable force on the victim which resulted in his death. This assignment of error is denied.

¶ 58 In her second assignment of error, Appellant contends that she was denied her constitutional right to counsel of her choice in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Art. 2, §§ 7 and 20 of the Oklahoma Constitution. The record reflects that on May 11, 2006, the State moved to disqualify David Christian from representing Appellant on the basis of an inappropriate physical relationship between Mr. Christian and Appellant; the existence of a conflict of interest between Mr. Christian and Appellant resulting from the physical relationship as well as statements made by Appellant to an undercover officer; an improper fee arrangement and improper financial payment; possession of relevant evidence in the form of a book bag belonging to Logan Tucker; and the appearance of impropriety. These reasons were set forth in detail in the State's Memorandum of Law (O.R.147–154).

¶ 59 Mr. Christian filed an objection and attached two sworn affidavits, one from him and one from Appellant. In her affidavit, Appellant listed the statements attributed to her by the State and said that "none of the statements were true." She further stated, "[a]t the time the statements were made, I was not aware that the person asking me questions was a law enforcement agent. At no time did he ever identify himself as a law enforcement agent." (Defendant's Exhibit A). Appellant also stated that Mr. Christian had fully explained to her that if she felt any of the things said in the State's recording were true, that she could file a report against him with the Oklahoma Bar Association, and she could have another attorney represent her in the case. In his affidavit, Mr. Christian also refuted and denied the State's allegations of any conflict or impropriety.

¶ 60 At the hearing, the parties stipulated that Mr. Christian paid the rent for Appellant's motel from July 9–15, 2002 (State's Exhibit 1), and that he paid for and was listed as a co-applicant with Appellant for an apartment (State's Exhibit 2). State's Exhibit 2 also contained a lease agreement for Apartment No. 52, dated July 15, 2002, listing Mr. Christian and Appellant as co-tenants. Mr. Christian also stipulated that if called to testify, Jamie Hensal would testify that in the summer of 2004 she found a backpack in Mr. Christian's garage and was told by Mr. Christian that he knew it was there, and she should put it somewhere so he could find it later if needed. The State alleged the backpack belonged to Logan Tucker and that his name was written on it. Mr. Christian would not stipulate to having any knowledge the backpack belonged to Logan.

¶ 61 The State then called Investigator Rick Stephens to the stand. Stephens testified that in his capacity as an undercover officer, he moved into an apartment on July 20, 2002, directly across from Appellant's apartment in the Briarwood Complex in Woodward. Stephens met Appellant the next weekend and over the next six weeks, the two had numerous conversations. Stephens tape-recorded these conversations. During these tape recorded conversations, Appellant told Stephens that a movie was going to be made on Logan's story and that Mr. Christian would be paid from the proceeds of the movie. Appellant also told Stephens that prior to the time they met, she had "made out" with Christian in a motel room. She said Christian told her he "wanted to have sex with her but he wouldn't because of her status." She said that at the time the police were executing a search warrant on her home, she and Christian were drinking at the City Limits bar. Appellant told Stephens she felt that Mr. Christian did not trust her and that he was tape recording her statements. She explained that she didn't know who to trust, that she couldn't even trust her attorney. Stephens testified that he turned the tape recordings over to the District Attorney. Stephens also testified that Appellant did not know he was with law enforcement and he never took her drinking or gave her alcohol. The tape recordings were admitted as State's Exhibits 4 and 5.

¶ 62 At the conclusion of the two day hearing, and after hearing arguments, the trial court found:

The court finds at this time that there is a conflict of interest of counsel and the client, that it exists, that it is a serious conflict and one which inevitably must affect strategy, and counsel is, therefore, disqualified.

The court would find that a wavier would be ineffectual, and that the conflict that the court considers at this time is one that has arisen out of the defendant's conduct and her statements as well as evidence that would tend to support those.

(Tr. 1/1/06, pg.43).[5]

¶ 63 We review the trial court's ultimate determination of whether an actual con-

5. In its written order, the court stated:
    The Court, having considered the evidence presented and the argument of counsel, finds that a conflict of interest exists between the defendant, Katherine Rutan, aka Katherine Pollard,

and her attorney herein, David B. Christian; that the conflict of interest is a serious conflict of interest which must affect strategy; that any attempted waiver of the conflict of interest by the defendant would be ineffectual; and that

flict existed *de novo,* and the court's resolution of the underlying facts giving rise to its conclusion is subject to a "clearly erroneous" standard of review. *Ellis v. State,* 1990 OK CR 43, ¶ 11, 795 P.2d 107, 110 citing *United States v. Soto Hernandez,* 849 F.2d 1325, 1328 (10th Cir.1988).

¶ 64 In *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court stated:

> The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." . . . [t]he purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. . . .

486 U.S. at 158–159, 108 S.Ct. at 1696–97 (internal citations omitted).

¶ 65 The Supreme Court further stated:

> The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

486 U.S. at 164, 108 S.Ct. at 1700.

¶ 66 In *United States v. Collins,* 920 F.2d 619 (10th Cir.1990), the Tenth Circuit Court of Appeals stated:

> the State's motion is well taken and should be granted.

A defendant's right to retain counsel of his choice therefore represents " 'a right of constitutional dimension,' " . . . the denial of which may rise to the level of a constitutional violation, . . . When a court unreasonably or arbitrarily interferes with an accused right to retain counsel of his choice, a conviction attained under such circumstances cannot stand, irrespective of whether the defendant has been prejudiced. . . . However, a defendant's right to retain counsel of his choice is not absolute and "may not 'be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same.' "

. . .

A defendant's choice of retained counsel must be respected "unless it would unreasonably delay proceedings or burden the court with retained counsel who was incompetent or unwilling to abide by court rules and ethical guidelines". . . Courts therefore must balance a defendant's constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice.

920 F.2d at 625–26 (internal citations omitted).

¶ 67 In *Banks v. State,* 1991 OK CR 51, ¶ 38, 810 P.2d 1286, 1295, this Court noted that the Oklahoma Constitution guarantees a defendant effective assistance of counsel who is free from conflicts of interest. The Court stated that the guarantee of effective assistance of counsel found in the State Constitution is coextensive to that found in the Constitution of the United States. *Id.* "The right to effective assistance of counsel includes the correlative right to representation that is free from conflicts of interest." *Carey v. State,* 1995 OK CR 55, ¶ 8, 902 P.2d 1116, 1118 citing *Wood v. Georgia,* 450 U.S. 261,

(O.R.205).

271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). "Counsel cannot be effective if conflicts of interest, no matter how subtle, dull the zeal of undivided loyalty. However, the mere appearance or possibility of a conflict of interest is not sufficient to cause reversal." *Banks*, 1991 OK CR 51, ¶ 34, 810 P.2d at 1296.

¶ 68 In the present case, the trial court did not specify a particular conflict as the basis for its disqualification of counsel. However, the State's evidence if believed, and even when weighed against counsel's denials, is sufficient to find that a conflict existed sufficient to warrant disqualification of counsel. *See* Oklahoma Rules of Professional Conduct, 5 O.S.2001, Ch., 1.App.3–A Rules 1.8(d), (e), and (j).[6] On appeal, Appellant asserts that as an officer of the court, defense counsel's opinion on the existence of a conflict "ought to carry some weight." Counsel's credibility, just as that of any other witness, was an issue for the trial court. Considering counsel's affidavit along with his argument at the hearing, (where counsel asserted the State's failure to prove the existence of any actual conflict), the trial court's credibility decisions are supported by the record.

■ ¶ 69 Appellant also challenges the trial court's ruling that any waiver on her part of a conflict of interest would be ineffectual. A defendant may waive any conflict of interest as long as the waiver is made "knowingly and intelligently." *Pisano v. State*, 1981 OK CR 137, ¶ 8, 636 P.2d 358, 361. However, "[n]ot all conflicts may be waived." *United States v. Schwarz*, 283 F.3d 76, 95 (2nd Cir. 2002). In *Schwarz*, the court said:

An actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation.... Under such circumstances,

the attorney must be disqualified, regardless of whether the defendant is willing to waive his right to conflict-free counsel ...

*Id.*, at 95–96 (internal citations omitted).

¶ 70 Further, in *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1698–1699, the Supreme Court explained:

Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented. As the Court of Appeals for the Third Circuit stated in *United ed States v. Dolan*, 570 F.2d 1177, 1184 (1978):

"[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver."

¶ 71 The trial judges of this state are vested with the responsibility to ensure that counsel appearing before them adhere to the standards of effective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by this Court. *See Bland v. State*, 2000 OK CR 11, ¶ 112, 4 P.3d 702, 730–731. Trial judges are required to ensure fairness and impartiality throughout the proceedings. In the present case, the trial court was faced with numerous conflicts which had

**6.** Rule 1.8(d) provides that prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on the information relating to representation. Rule 1.8(e) provides that a lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except for a lawyer

may advance court costs and expenses of litigation and a lawyer who represents an indigent client may pay court cost and expenses of litigation on behalf of the client. Rule 1.8(j) prohibits a sexual relationship between a lawyer and a client unless 1) a consensual sexual relationship existed between them when the client-lawyer relationship commenced, and 2) the relationship does not result in a violation of Rule 1.7(a)(2).

the potential to adversely affect Mr. Christian's representation of Appellant. The record before us shows that Mr. Christian was put in the position of defending his credibility at his client's expense in the face of evidence that he agreed to split the movie rights with her, that he paid for her living expenses, that he "made out" with her and wanted to have sex with her and that he didn't believe her stories about the disappearance of her son. In this situation, "no rational defendant would knowingly and intelligently desire" that Mr. Christian continue his representation.

¶ 72 On the record before us, the presumption in favor of the defendant's right to counsel of choice was overcome "by a showing of a serious potential for conflict." Therefore, the trial court properly disqualified Mr. Christian from representing Appellant and this assignment of error is denied.

¶ 73 In her third assignment of error, Appellant argues that the trial court erred in admitting irrelevant and prejudicial evidence of other bad acts which amounted to nothing more than "character assassination." Specifically, she complains about testimony from Delbert and Faye Randell, that while visiting in the Randell home, Appellant flirted with Mr. Randell whenever his wife left the room, that within a week or two of the break up of Appellant's marriage, she began living with a man she had just met, and that following the breakup of that relationship, Appellant moved to a low-income apartment and began posting on internet dating sites that she was looking "for one night stands;" State's Exhibit 1, an internet personals ad submitted by Appellant which included responses by Appellant that she did not have any children and she was not sure if she wanted any; testimony from Michael Pettey that his relationship with Appellant "got physical" on the first weekend they met face to face; e-mails between Appellant and Pettey showing the relationship was becoming more serious to Appellant than to Pettey and references to particular sexual activity they were going to engage in when they were next together; testimony regarding Appellant ac-

companying Pettey to a biker rally the first weekend after Logan disappeared and her participation in a topless contest; and admission of photographs from the rally and the contest. Appellant also complains about testimony from co-worker Jamie Adams, that after Logan's disappearance, Appellant said she had only one son who was 4 years old and that Appellant told her about entering the topless contest and why she didn't win.[7]

¶ 74 Title 12 O.S.2001, § 2404(B) prohibits the admission of evidence of "other crimes, wrongs, or acts" to prove the character of a person in order to show action in conformity therewith absent one of the specifically listed exceptions. An act that is not a violation of the criminal law is nonetheless governed by § 2404(B) if it carries a stigma that could unduly prejudice an accused in the eyes of the jury. *Eizember v. State*, 2007 OK CR 29, ¶ 75, 164 P.3d 208, 230. However, evidence that a defendant committed other crimes or bad acts is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. *Lott v. State*, 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334. When the State seeks to introduce evidence of a bad act or crime other than the crime charged, it must comply with the procedures in *Burks v. State*, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds, Jones v. State*, 1989 OK CR 7, 772 P.2d 922. *Id. Burks* requires, in part, the State give a pre-trial notice of the other crimes or bad acts evidence it intends to introduce. *Id.*

¶ 75 Appellant first asserts that not all of the evidence complained of above was included in the State's *Burks* notice. The record shows that most, but not all, of the evidence set forth above was included in the State's pre-trial notice. However, Appellant has a claim of error under *Burks* only if she can show she was surprised by the evidence. *Eizember*, 2007 OK CR 29, ¶ 75, 164 P.3d at 230 (the purpose of the notice requirement is to prevent surprise on the part of the defense). Appellant is not complaining about surprise in this case. Rather, she complains

---

7. The prior bad acts evidence admitted without a defense objection has been reviewed for plain error only, and none has been found. *See Eizember*, 2007 OK CR 29, ¶ 92, 164 P.3d at 233.

the evidence was not relevant to any issue in the case.

¶ 76 As Appellant correctly notes, the State's theory in this case was that she killed Logan so she could finally lead the life she wanted to lead, free from the responsibilities of caring for him. Appellant even acknowledges that evidence of her prior treatment of Logan, particularly when compared with that of J.D., her stated feelings toward him and her desires to hurt and kill him were relevant to show her motive and intent on June 23, 2002. However, contrary to Appellant's assertions, it was entirely appropriate for the jury to hear evidence of her string of failed relationships with men and her placing the blame for those failed relationships on Logan's behavior and personality, her increasing determination not to let Logan ruin another relationship, and her complete lack of remorse and concern for her missing son when she was finally able to do what she wanted and go to the biker rally the first weekend after his disappearance. This evidence was highly relevant to show her motive and intent. *See Andrew v. State*, 2007 OK CR 23, ¶¶ 49–53, 164 P.3d 176, 191–192 (evidence of defendant's sexual affairs which had ended prior to the murder of her husband was relevant to show her motive and intent).

¶ 77 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. 12 O.S.2001, § 2402. Some of the prior bad acts evidence admitted in this case carried a great risk of prejudice. However, a review of the record shows that in light of evidence of Appellant's own statements to numerous people that she blamed Logan for the failure of her relationships, her varied and inconsistent statements regarding his whereabouts after June 23, 2002, and her conduct during the days following his disappearance, any error in admitting the bad acts evidence was harmless beyond a reasonable doubt. The trial court did not abuse its discretion in admitting the complained of evidence. *See Eizember*, 2007 OK CR 29, ¶ 99, 164 P.3d at 234.

¶ 78 Appellant also finds error in the trial court's failure to issue a limiting instruction on the use of prior bad acts evidence. Such an instruction was never requested by Appellant, and based upon the record in this case, we find no plain error in the omission of such an instruction. *See Powell v. State*, 2000 OK CR 5, ¶ 68, 995 P.2d 510, 527. Accordingly, this assignment of error is denied.

¶ 79 In her fourth assignment of error, Appellant contends she was denied the effective assistance of counsel. An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Eizember*, 2007 OK CR 29, ¶ 151, 164 P.3d at 244, *citing Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. *Id.* First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. *Id.* Unless the defendant makes both showings, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id. quoting Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

¶ 80 Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* 2007 OK CR 29, ¶ 152, 164 P.3d at 244. The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Id.*

¶ 81 Appellant first complains that counsel was ineffective for failing to object to

certain bad acts evidence set forth in Proposition III. Any failure on counsel's behalf to raise an objection is not indicative of ineffective assistance. As shown in Proposition III, the evidence was either properly admitted or any error in its admission was harmless. Where objections that might have been raised would have been properly overruled and those that might have been sustained would have amounted to at most harmless error had the ruling been incorrect, Appellant has failed to show that any errors by counsel were so great as to render the results of the trial unreliable. *Phillips v. State*, 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044.

¶ 82 Appellant also asserts counsel was ineffective in failing to timely appeal the trial court's decision to disqualify Mr. Christian from representing her by seeking extraordinary relief in this Court. As shown in Proposition II, the trial court's ruling on disqualification was proper. Even if an appeal had been filed it would have been denied by this Court. Therefore, Appellant is unable to show that she was prejudiced by the absence of an appeal, and her claim of ineffectiveness in this regard is denied. Accordingly, this assignment of error is denied.

## DECISION

¶ 83 The Judgment and Sentence is **AF-FIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2008), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J., and A. JOHNSON, V.P.J., concur.

CHAPEL, and LEWIS, JJ.: concur in result.